## No. 13,716.

## L. J. McCLURE AND WIFE VS. MARY McMARTIN AND HUSBAND.

### SYLLABUS.

1. Where slanderous reports are shown to have been originated or circulated, the law presumes malice upon the one hand, and injury upon the other, and damages will be awarded.
2. Where a defendant, charged with the utterance of certain slanderous statements, does not attempt to justify or plead in mitigation, but denies the utterance of the statements as charged, evidence tending to establish the truth of such statements should be excluded.
3. The husband not shown to have been cognizant of the slanderous utterances of his wife is not liable therefor.

APPEAL from the Eighteenth Judicial District, Parish of Calcasieu —*Miller, J.*

---

*Cline & Cline* for Plaintiff, Appellant.

---

*Schwing & Moore* for Defendants, Appellees.

---

The opinion of the court was delivered by

MONROE, J. This is an action in damages, for slander. The petition alleges, in substance, that the defendant, Mrs. Mary McMartin,

wife of J. G. Martin, between May 1st and July 24th, 1899, wantonly and maliciously originated and circulated false, slanderous and defamatory statements about Mrs. Jennie McClure, wife of L. J. McClure, plaintiff herein, for the purpose of injuring her character and good name.

That in the town of Jennings, she said to Mrs. Blackshear, at a time when Mrs. McClure was about to return from Sour Lake, Texas: "Are you going to let Mrs. McClure come back to your house to board?", Mrs. Blackshear, who ran a boarding house, said, "Yes; why?" "Because," said Mrs. McMartin, "she is a bad woman and will ruin your house and your daughters," or words to that effect. That Mrs. McMartin also told Mrs. Blackshear that a certain married woman had told Mr. McClure that "he must get his wife out of town within two weeks or she would be waited on;" and that Mrs. McMartin told Mrs. Montanya, "that Mrs. McClure had been very intimate with three gentlemen in Jennings, to-wit: Dr. Wilkinson, Mr. Spencer and Mr. Wright, and that, upon a certain occasion, she had followed Mr. Spencer to Houston." That she further stated to Mrs. Montanya that U. S. Phillips had said, "if this case ever comes into court, no woman will be permitted to remain in the court room, as the evidence which will be adduced against Mrs. McClure will be so indecent;" and that she also said that she could get six women and fourteen men to testify to the bad character of Mrs. McClure. It is further alleged that the statements mentioned were false and malicious, and that Mrs. McClure has been damaged thereby in the sum of $10,000, for which judgment is prayed.

J. G. McMartin filed an exception of "no cause of action," which was sustained, and the suit, as to him, dismissed. Mrs. McMartin answered, in substance, as follows, to-wit: that she had heard the report that Mrs. McClure had exposed a portion of her person in the presence of two or more persons, to-wit: Messrs. B— and W—; that she had shown an unusual interest in Mr. Spencer, and had insisted on having the room at Mr. Blackshear's boarding house nearest the one occupied by him; that she had heard that Mrs. McClure was often seen sitting on the porch late at night with Mr. Spencer, while her husband was engaged at his office; that she had heard that Mrs. McClure had acted on a wagonette party in a very peculiar manner, being very gay in the morning, and out of humour in the evening, and had the next day given as a reason that Mr. Spencer had insulted her while in bathing; and that, having been asked if she had reported it to her husband, she had replied that she would not do that, and yet, that she was immediately seen on

the most friendly terms with Mr. Spencer; that she had heard that Mr. Wright had been in Mrs. McClure's bedroom; and that Mrs. McClure kept her bed "as if hogs had wallowed in it".

Defendant further avers that having heard these and other like reports, and some of them having been mentioned while she was in the presence of Mrs. Blackshear and Mrs. Abbott, she (defendant) remarked, "if these reports are true which are going around town, was she, Mrs. Blackshear, not afraid that it would hurt her house?" And defendant did then say that a woman "had told her that Mrs. McClure had to leave Jennings in two weeks, but defendant did not state the reason why she was to go, nor that she would be waited on."

"And defendant declares that all the above reports were in circulation, and that Mrs. McClure was talked about, all of which will be established on the trial of this case. And defendant further declares that she did not repeat the reports above stated, or those with which she is charged in plaintiffs' petition, and never originated a single injurious report about the plaintiff, and made the remarks herein admitted to have been made only in the presence of the parties from whom she had first heard some of these reports and in consequence of their conversation with her, and without malice or the desire to injure the plaintiff," Mrs. McClure.

She denies that anything actually said by her could have injured the plaintiff and alleges that this suit is malicious, and she prays for damages, in reconvention.

There was a verdict and judgment in the court a qua, rejecting the demand of the plaintiff and the matter has been brought before this court by appeal.

It may be remarked here that the suit should have been brought by, and in the name of, the husband, alone. The joiner of the wife may, however, be treated as surplusage. Cooper vs. Cappel, 29 Ann. 215; Barton vs. Cavanaugh, 12 Ann. 333; Holzab vs. R. R. Co., 38 Ann. 188.

The evidence shows that the plaintiff, Lester J. McClure, was the station agent and telegraph operator at Jennings, in this State, in the summer of 1898, and that he and his wife boarded and lodged at the house of Mrs. Blackshear, together with several other men, boarders. They appear to have been a comparatively young couple (although they had been married about ten years), and she had borne an unblemished reputation all her life, in Iowa, where she had lived before coming to Louisiana. But she was of a lively disposition, and, situated as she was, in a boarding house, where the other boarders were men,

whilst her husband was kept at his place of business for a great many hours out of the twenty-four, she became the subject of some criticism, which took hold of and distorted trifles, harmless in themselves, to her prejudice. Nevertheless, her reputation had not been seriously affected, when, some time prior to the month of June, 1899, her husband, having been so ordered by his employer, the railroad company, moved to Texas and she went with him. Thereafter, wishing to return to Jennings, perhaps, temporarily, she wrote to her former landlady, Mrs. Blackshear, for board and lodging, and received a reply to the effect that she would be accommodated. At this juncture, the defendant, Mrs. McMartin, was guilty of the intermeddling which has given rise to this suit. It appears that she heard that Mrs. McClure was about to return to Jennings and to become again the guest of Mrs. Blackshear, and she took it upon herself to warn Mrs. Blackshear against receiving her. The evidence shows that she and Mrs. Blackshear met at the house of Mrs. Abbott, and Mrs. Blackshear gives the following testimony as to what took place, to-wit: "I remember of having a conversation with Mrs. McMartin; she asked me if Mrs. McClure was coming back to board with me; and I said she was. Mrs. McMartin said, don't let her do that; and I asked her why; and she said, have you heard and don't you know that she is a bad woman?

"Q.—What else did she say?

"A.—In the course of the conversation, she asked if I knew what took her away from Jennings; I said because I heard that her husband got a promotion and better wages; she said there was a certain woman told Mrs. McClure to get out of town inside of two weeks or she would be waited on.

"Q.—When she told you not to let her come to your house to board, did she tell you what would happen?

"A.—She said it would ruin my house and daughters.

"Q.—What else did she say?

"A.—That was the sum and substance of it. * * *

"Q.—Did you ask her for this information, or did she give it voluntarily?

"A.—Voluntarily."

Mrs. Blackshear went on testifying at considerable length, and was subjected to a protracted cross-examination, but that portion of her testimony which is relevant to the case, and which was in no wise affected by any other statements, is embodied in the foregoing excerpt. The version which the defendant, Mrs. McMartin, attempts to give of

the conversation, thus testified to by Mrs. Blackshear, is, that, with the exception of the statement as to Mrs. McClure's having been obliged to leave town, she only said to Mrs. Blackshear, "If these reports which are going around town are true, I should think that you would be afraid it (the reception of Mrs. McClure as a guest) would hurt your house and daughters". When interrogated as to whether in thus referring to the reports, she gave Mrs. Blackshear the benefit of her information, which seems to have been very comprehensive as to their nature, her denial is so weak as to amount almost to an admission. For instance, being asked whether Mrs. Blackshear was not an old friend and whether she intended any harm to Mrs. McClure by the advice she gave Mrs. Blackshear concerning her, she says, "No, sir; if I had been in Mrs. Blackshear's place and had heard so many things, I would thank her to come to me and tell me as a friend. * * * Q.—Do you deny, then, having alleged that these things were true? A.—Yes." Elsewhere in her examination, she is asked: "Q.—Did you state to Mrs. Blackshear and Mrs. Abbott what the reports were? A.—I said, 'If these reports were true'. Q.—Did you state what they were? A.—I don't think." If the witness means, "I don't think I did state what they were", the answer is still a weak and insufficient denial in view of the circumstances and other testimony bearing on the same point. Thus, in addition to the direct testimony of Mrs. Blackshear, it appears that, within a few weeks after the conversation in question, the Baptist church, of which Mrs. McClure and Mrs. McMartin were members, took up the matter of the reports which were in circulation concerning Mrs. McClure and appointed a committee, consisting of the pastor and two members, to investigate and report. The pastor, and then the committee, waited upon Mrs. McMartin and interrogated her upon the statements which she was said to have made to Mrs. Blackshear, and also, generally, as to any information which she might have, bearing upon the subject under investigation. Some representations were made to her by the committee, whereby she was led to believe that her disclosures, within a certain limit, would be regarded as confidential, but this did not relate to anything which she might say concerning the statements previously made by her to Mrs. Blackshear. As to any new matter, that is, any reports concerning Mrs. McClure which had not already been originated or circulated by Mrs. McMartin, it may fairly be held that her disclosures to the committee of her church, calling upon her under such circumstances, fall within the category of privileged communications, for which, if made in good faith, she would incur no lia-

bility whether they were imparted on condition that they would be kept secret or not. Her own testimony as to the understanding between herself and the committee is as follows, to-wit:

"Q.—When that committee called upon you, did you understand that they came to you with the authority of the church?

"A.—They told me that Mrs. McClure had preferred charges against me for things I had said at Mrs. Blackshear's.

"Q.—Did they tell you what it was?

"A.—They asked me what it was and I gave it to Mr. McLendon, *who has them written down just exactly as I made them.* (Italics by the court.)

"Q.—When Mr. McLendon came to you, did he tell you what charges Mrs. McClure made against you?

"A.—They repeated the reports, and Mr. McLendon said they were very similar to what Mrs. Blackshear had said.

"Q.—Did they promise that everything you said would be secret?

"A.—Yes, sir; after I gave in what I said to Mrs. Blackshear—I expected that would be made public in the church. Mr. McLendon said to me, tell all you know, and we promise it will go no further.

"Q.—Then, when you made your statements to them, did you make them for the purpose of circulating the report?

"A.—Nothing but the two remarks I made to Mrs. Blackshear; I thought I was making it to an investigating committee."

Turning now to the testimony of Mr. McLendon, the pastor of the church and chairman of the committee, we find the following; being asked whether there was any trouble in his church, he replied: "There was trouble between Mrs. McClure and Mrs. McMartin."

"Q.—What was the nature of that trouble?

"A.—It was reports of scandal reported to the grievance committee by Mrs. McClure that Mrs. McMartin had made concerning her. It was my duty to have the matter investigated.

"Q.—Did you go alone to see Mrs. McMartin?

"A.—Yes, sir.

"Q.—What occurred?

"A.—I told Mrs. McMartin that Mrs. McClure had made these charges and that the grievance committee had the matter in hand and desired to make an investigation, and wanted to see her, if convenient; she said she was ready and the least Mrs. McClure had to say about the matter the better it would be for her; that Mrs. Mc-Martin had told Mrs. Blackshear that she, Mrs. McClure, was a bad

woman, and that, if she permitted her to board at her boarding place, it would ruin the reputation of her house and ruin her daughters; she did also charge that Mrs. McClure was made to leave the town of Jennings.

     *     *     *     *     *     *     *     *

" * * *  The committee called to see Mrs. McMartin and told her the object of their visit, that it was to investigate the charges that Mrs. McClure made against her * * *. In the conversation had with her, she said she told Mrs. Blackshear things she had heard. She prefaced her statement with that statement, she told Mrs. Blackshear that there were bad reports on Mrs. McClure, and advised her, Mrs. Blackshear, on having Mrs. McClure board with her, and that if she were in her place she would write to Mrs. McClure not to come to her place to board."

Mr. Kokonour, a member of the committee referred to, gives the following testimony concerning the interview with Mrs. McMartin: "Mrs. McMartin said that when she learned that Mrs. McClure was about to return to Jennings from Sour Lake, Texas, where she had been for some time, she warned Mrs. Blackshear, who conducted a boarding house, that it would be best for her not to allow Mrs. McClure to come to her house, as she would ruin the reputation of the house and Mrs. Blackshear's daughters."

These witnesses narrate a good deal more that was said by Mrs. Mc-Martin, which we do not consider, giving her the benefit of the view that it was privileged.

The foregoing is, however, absolutely conclusive, even according to her own admissions made as a witness in this case, that she told Mrs. Blackshear that Mrs. McClure was a bad woman who had been forced to leave the town of Jennings, and who, if received again into her house, would ruin its reputation and would ruin Mrs. Blackshear's daughters. It is also made reasonably certain that Mrs. McMartin prefaced her warning to Mrs. Blackshear by telling her the damaging things that she had heard concerning Mrs. McClure. Observe that the witness, Mc-Lendon, says, "She said she told Mrs. Blackshear things she had heard". Mrs. Abbott, who was the third person in the interview between Mrs. McMartin and Mrs. Blackshear, and who was sworn as a witness on behalf of the defendant, gives the following testimony: "Mrs. McMartin asked Mrs. Blackshear if she had heard the reports going around about Mrs. McClure", and she went on to say, "If the reports were true, if she were Mrs. Blackshear, she would not have her come back to her house to

board. * * * If these things are true that are going around town, Mrs. McClure isn't a decent woman."

The witness is apparently willing that the inference should be drawn that Mrs. McMartin did not state what the reports were upon the basis of which she was assuming to warn Mrs. Blackshear; but she does not so testify. And, at another time, in the course of a somewhat protracted examination, being asked, "whom she had heard discussing the reputation of Mrs. McClure, she said, Mrs. Cutting, Mrs. Blackshear often, Mrs. McMartin, Mrs. Derouen", (the lady last named being Mrs. McMartin's daughter). Q.—When did the conversations occur? A.— I could not say; they talked so much, I don't remember."

We reach the conclusion, therefore, that Mrs. McMartin prefaced her advice to Mrs. Blackshear by repeating, and thus giving further cur-. rency to, the various slanderous reports which she had heard concerning Mrs. McClure, and which she recapitulates in her answer filed in this case.

Apart from this, Mrs. Montanya, a witness for the plaintiff, gives the following testimony as to other statements made by Mrs. McMartin: "I " heard Mrs. McMartin say of Mrs. McClure that she, Mrs. McClure, " with Mr. Spencer, Mr. Wright and Dr. Wilkins, had been intimate, the " substance of what I heard from her was, inferentially, that Mrs. Mc- " Clue was intimate with Mr. Spencer, and that her conduct with the " others was fast. I heard this from Mrs. McMartin at Jennings, La., " during the year 1899."

" Int. 4th. Did not Mrs. McMartin tell you that U. S. Phillips had " informed her that no woman would be permitted in court on the trial " of this case, or words to that effect? A.—All that Mrs. McMartin " said with reference to what U. S. Phillips had informed her was, that " he said that no decent woman could sit in the court and listen to the " trial. * * * Int. 6th.—Was anything, or not, said by Mrs. Mc- " Martin in your presence during the summer or spring of 1899, about " being able to get six men and fourteen women to testify about Mrs. " McClure's bad character? If so, state the substance of what she said " on that subject as near as you can remember? A.—In the spring " of 1899, at her front gate in Jennings, La., in my presence, and " to me, she said that she knew six women and fourteen men who would " testify about Mrs. McClure's bad character, and that was the sub- " stance of her conversation at that time. Cross Int. 1.—Did Mrs. Mc- " Martin ever tell you that Mrs. McClure had been intimate with three " gentlemen in Jennings, namely, Dr. Wilkinson, Mr. Spencer and Mr.

" Wright, and that on a certain occasion, Mrs. McClure had followed
" Mr. Spencer to Houston? A.—Yes, except that 'Dr. Wilkins', was
" one of them named and not 'Dr. Wilkinson.' " Mrs. McMartin denies
that she made the statements attributed to her by this witness, except
that with regard to the persons who would testify, etc., as to which she
says: "I said that in case it came to court, I could get enough gentlemen
and ladies to come to court and testify to what I said." * * * Q.—
" (on cross-examination). You said in explanation of one of your an-
" swers, that you did tell Mrs. Montanya that you could get plenty of
" ladies and gentlemen to testify to the truthfulness of what you said.
" A.—I meant what I said to the committee and church people, those
" two reports."

Some attempt was also made, by means of a witness named Harris,
to discredit the testimony of Mrs. Montanya. Upon a careful considera-
tion of the matter, however, we are of opinion that it is entirely worthy
of credence. Aside from the testimony which we have thus reviewed,
there is a great deal which is wholly irrelevant and which should have
been excluded upon objections properly made. And the conviction that
our learned brother of the District Court has erred in permitting evi-
dence, greatly to the prejudice of the plaintiff, to go to the jury, relieves
us of any doubts which we might otherwise entertain as to the propriety
of setting aside a verdict in a case of this character.

The rulings, upon the admissibility of evidence, in which we think
there was error, are fairly illustrated by the following instances, to-wit:
In the cross-examination of Mrs. Blackshear: "Q.—What was the rela-
" tive situation of Mrs. McClure's room to Mr. Spencer's (objected to
" by counsel for the plaintiff as not covered by the pleadings. The
" court overrules the objection because the defendant has a right to
" show conduct of the plaintiff in the case.) A.—They occupied two
" front rooms and the hall divided them. * * * Q.—Didn't Mr.
" Evans occupy the room that Mrs. McClure afterwards occupied?
" A.—Mrs. McClure had the room at one time and she went away, and
" while she was away Mr. Evans had the room. Q.—And when she
" came back? A.—Mr. Evans gave up that room and took another one.
" Q.—Did she not demand that room? A.—I don't know; I think she
" wanted that room, but I am not positive."

Now the whole purpose of this testimony, as abundantly appears from
the entire conduct of the defence, was to create upon the minds of the
jurors the impression that, as a particular and concrete fact. there were
improper relations existing between Mrs. McClure and Mr. Spencer.

And, although the evidence admitted was wholly inadmissible, and, being admitted, wholly and utterly fails to establish the fact sought to be proved, it may, nevertheless, have seriously prejudiced the minds of the jurors against the plaintiff and his wife. That such evidence was inadmissible is susceptible of easy demonstration. Mrs. McMartin is sued for damages resulting from her alleged slander of Mrs. McClure, and, among other things charged against her, it is said she told Mrs. Montanya, that Mrs. McClure had been intimate with three gentlemen, one of whom was Mr. Spencer. As was said in Williams vs. McManus, 38 Ann. 161, "In an action of this character, the only possible defences are, " either a denial, or a justification, or a confession under mitigating cir- " cumstances." R. S. 3640; 14 Ann. 406; 15 Ann. 166; 36 Ann. 469.

The defendant, Mrs. McMartin, has partly admitted, and partly denied, but she has set up no plea of justification. She has admitted that she said, in the presence of Mrs. Blackshear and Mrs. Abbott, that a woman had told her that Mrs. McClure had to leave Jennings "in two weeks". She has denied the utterance of any other language which could be construed as slanderous; and she has particularly denied that she ever said that Mrs. McClure had shown an unusual interest in Mr. Spencer, or had insisted on having the room nearest the one occupied by him. Under these circumstances, it is plain that she ought not to have been permitted to introduce evidence to establish the truth of such charges, nor does it meet the objection to say that she was entitled to show Mrs. McClure's character, whether in mitigation of damages, or because Mrs. McClure had opened the door by tendering proof of her good character, since it is incompetent to enter into an investigation of specific acts of alleged misconduct for the purposes of such an inquiry, the most that the defendant could, under the circumstances, claim the right to prove being that Mrs. McClure's general reputation, was indifferent or bad.

Mrs. Blackshear was afterwards asked to name other persons than Mrs. McMartin from whom she had heard specific reports damaging to the character of Mrs. McClure. She was asked whether she had ever heard of Mrs. McClure having been in Mr. Spencer's room, and whether she had ever heard that Mrs. McClure had exposed her person in the presence of two or more gentlemen in her (the witness') house—which questions, though objected to, were permitted by the court. And yet, it would seem to be clear enough that, if the plaintiff is unwilling to assume the responsibility of asserting in her pleadings that certain reports, which she is charged with having circulated, were true, but, on

the contrary, distinctly disclaims such an assertion, she ought not to be permitted to introduce evidence to prove that they were true. When Mrs. Abbott, a witness for the defendant, was placed on the stand, she produced a written memorandum from which she was allowed to refresh her memory, in testifying, concerning the conversation which has already been referred to as having taken place between Mrs. McMartin, Mrs. Blackshear and the witness. It is true that the witness states that the paper was prepared by her "shortly" after the conversation, but, later on, and in her cross-examination, it appears that it was prepared at the request of the defendant, not at the time, or immediately after, the conversation took place, but after the church, of which the defendant was a member, had taken up the matter of the slander with which she was charged; so that the word "shortly", as used by the witness, has a very indefinite signification. Under these circumstances, the objection to the use of the paper ought to have been sustained. The witness was asked if she remembered having heard a Mrs. Cutting say anything about this "McMartin-McClure matter", and the question was objected to, but the objection was overruled, and the answer, "She said she did not know why Mrs. McClure wanted to make a fuss about these things, that she had been the town talk for a year," was permitted to go to the jury; under what rule of evidence we are not advised, and we are not able to conjecture.

The following testimony of Roy Cooper, a young man who was sworn as a witness for the defendant, was allowed to go to the jury, to-wit: " Q.—Did you ever hear any report in regard to Mrs. McClure in that " town, damaging to her character? (Objected to as irrelevant, objec- " tion overruled and counsel for plaintiff excepts to ruling and reserves " this in lieu of a bill.) A.—What I considered damaging, if it was a " wife or sister of mine. Q.—About how long ago was it you heard " these reports? A.—Just before I went to work in the Post Office, that " was the latter part of June, I believe. Q.—What reports did you hear? " A.—I was crossing the street with a young man and he asked me who " was that lady on the porch at Mrs. Blackshear's; I asked him to whom " he had reference, and he designated Mrs. McClure; he asked me what " kind of a woman she was, I told him I did not know, and he smiled " and said, he thought he could have fun with her * * * (Cross- " Ex.) Q.—This young man you spoke of first, he did not say he knew " Mrs. McClure, he wanted you to tell him who she was? A.—He asked " for her name. * * * Q.—He did not claim to have had relations " with Mrs. McClure? A.—No, sir. * * * Q.—Isn't this man a

" man who is always looking after women with a view to find the kind
" you spoke of, a licentious man ?  A.—I heard him speak several times
" about admiring the forms of women."

And so, the casual remarks of a perfect stranger, passing on the street,
who chose to make some ribald comment upon a woman whom, so far as
we are informed, he had never seen before, of whose name he was ignor-
ant, and who, apparently, was conducting herself with perfect propriety
at the time, was allowed to go to the jury in support of the denial on
the part of the defendant before the court that she has uttered or circu-
lated certain slanderous charges concerning the subject of that com-
ment.  It is small wonder that there was a verdict for the defendant,
which, upon the case as we find it in the record, must be set aside.

There is no evidence before us upon the basis of which a judgment
could be rendered against Mr. McMartin.  In fact it is not shown that
he is the husband of Mrs. McMartin.  But, if that be conceded, it is
not shown that he was cognizant of the utterances of his wife which
have given rise to this suit, and we know of no law in Louisiana under
which he could be held liable for the damages here claimed.  Upon the
other hand, the legal principles applicable to the facts which we have
found leave no room for doubting the liability of Mrs. McMartin.
" Every person has a right to enjoy that degree of respect, good will
" and social or business distinction to which his own acts and his social
" or business habits entitle him, and anyone who unlawfully interferes
" with this right by circulating slanderous reports, renders himself lia-
" ble for consequent damages."  Williams vs. McManus, 38 Ann. 161;
Savoie vs. Scanlan, 43 Ann. 967.

" Damages are necessarily due for libel and slander.  The law pre-
" sumes damages to follow from the injurious words spoken or uttered
" against the plaintiff."  Wimbish vs. Hamilton, 47 Ann. 254; Weil vs.
Israel, 42 Ann. 962; Mequet vs. Silverman, 52 Ann. 1369.

" In giving currency to libelous or slanderous reports and publications,
" a party is as much responsible, criminally and civilly, as if he had or-
" iginated the defamation."  Staub vs. Van Benthuysen, 36 Ann. 467.

"Tale bearers are as bad as tale makers."  Harris vs. Minvielle, 48
Ann. 908.

The only remaining question is as to the amount.  It would be im-
possible to fix upon any particular sum of money which would alto-
gether make good the injury which has been inflicted by the defendant
upon the plaintiff.  Upon the other hand a favorable judgment in the
case which is here presented is at once a vindication of the one and a re-

buke to the other litigant, and we must not add a penalty in money greater, perhaps, than the defendant can bear. We shall, therefore, fix the damages to be allowed at $500.00. For these reasons, it is ordered, adjudged and decreed that the verdict and judgment appealed from be annulled, avoided and reversed. And it is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Lester J. McClure, and against the defendant, Mrs. Mary McMartin, wife of John G. McMartin, in the sum of five hundred dollars ($500), together with costs in both courts. It is further ordered and adjudged that, as to the defendant John G. McMartin, the judgment appealed from be affirmed.