ROGERS, J.
 

 In the month of July, 1923, a Ford truck driven by plaintiff, with one D. C. Reid, as an occupant, was struck by a cut of gondola cars of the defendant company at a crossing over one of its spur or switch tracks. As a result of the accident the occupants of the truck were seriously injured. They instituted separate suits for damages, plaintiff for $20,000, and Reid for $5,000. The suits were consolidated for the purpose of trial in the district court, and resulted in judgment in favor of the present plaintiff for $6,000 and in favor of Reid as prayed for. On appeal to the Court of Appeal for the Second Circuit, both judgments were set aside, one judge dissenting, and the demands of plaintiffs were dismissed. Pending their applications for a rehearing, one of the concurring judges died, and upon the selection and qualification of his successor the applications were granted.
 

 On the rehearing, the court found that' the defendant company was guilty‘of negligence, and that Reid, the idle occupant of the car, was not negligent, and reduced the award of the district court in his favor from $5,000 to $4,000, and, as thus reduced, affirmed the judgment. In the other case, the court held that notwithstanding the negligence of the defendant company, the plaintiff was himself guilty of contributory negligence, and it reinstated its former decree.
 

 This court refused a writ applied for by the defendant company in the Reid Case, and granted the writ applied for by plaintiff in this case, which, in consequence of our order, we are now called upon to review.
 

 The facts appearing in the record show that the accident occurred in Tioga, a village of approximately 500 people, in the parish of Rapides. The main line of the defendant railroad company runs north and south through the center of the village. All the property east of and contiguous to the
 
 *875
 
 railroad right of way is owned and used by the Leé Lumber Company.
 

 About 440 feet north of where the accident happened, a switch track designated as the “government track” branches off from the east side of the main railroad line and enters the property of the lumber company. About 50 feet further westward is another spur traqk which branches off from the “government track,” and is known as “Missouri Pacific No. 1.” Prom the west side of this second spur track a third spur track branches off, and is called “Missouri Pacific No. 2.” Both of these spur tracks run in the same general direction as the “government track” and the main line of the railroad company.
 

 On the property of the lumber company and between the “government track” and track “No. 1,” there stood an icehouse and a meat market (the latter torn down at the time of the trial). North of these buildings and across an alley 20 feet wide a barber shop is located. About 200 feet north of the north side of this barber shop a public highway, constructed and maintained by the parish, runs east and west, crossing all the trackage of the defendant coinpany. From this highway, at a point approximately 100 feet east of the “government” spur track, an open road branches off at- right angles and runs south in front of the lumber company’s office and towards the barber shop and icehouse. Opposite those buildings this roadway divides, one branch continuing southward to the sawmill, and the other turning westward and crossing the “government” spur track. Just after crossing this track, the roadway divides again, one of its branches continuing westward into the alley between the barber shop and the icehouse, and the other running southward, then around the south end of the icehouse, and then westward to the depot on the main line of the defendant company. The road and crossing in question here are not public in the sense that they are a parish highway or village street and a highway crossing or street crossing, but they are public in the sense that they are used by pedestrians and vehicles at ail hours of the day, to the knowledge of the employees of the defendant company.
 

 The truck which the plaintiff was driving was owned by the lumber company, and ■was used by him for the delivery of ice, for which he was employed. On the day of the accident, plaintiff, as was his daily custom, drove his truck into the alley between the barber shop and the icehouse in order to obtain ice for delivery to the patrons of his employer. In doing this it was necessary for ■him to cross the “government” spur track. After loading the ice on the truck, he attempted to back his truck out the way he • had driven in. This was the usual and only manner in which it was possible for him to emerge from the alley. This alley, as heretofore stated, was formed by the south side of the barber shop and the north side of the icehouse, and a small building, since removed, located just east of the ice-house. The southeast corner of the barber shop is 30 feet from the west. rail of the track at the crossing, and the northeast corner of the small building referred to was 17 feet from the rail. Extending out 6 feet west of the west rail of the track is a plank approach to the crossing.
 

 Plaintiff backed his truck until its rear wheels rested against the west edge of the lfiank approach. Here he stopped, and, without “killing” the engine, looked up and down the track, i-lis view up the track, with the exception of a distance of approximately 83 feet, was obstructed by the northeast corner of the barber shop. But the place where he stopped was as near the track as it was practical for him to stop before attempting to pass over the crossing. Neither seeing nor
 
 *877
 
 hearing the approaching ears, he proceeded to back the truck up the plank approach and across the track at a speed of about 2 miles an hour. When the rear wheels of the truck reached the east, or far, rail of the track, it was struck just behind the driver’s seat by the gondola ears in question. These cars, 'six in number, were part of a train of cars, consisting of one box car, three flat cars, and the six gondola cars, drawn by a locomotive. Wishing to place these cars at certain points on the three switch tracks hereinbefore referred to, the employees of the company worked the train to a point on the main track where the south end of the rear car, which was a box car, was north of the “government” switch track. Then, simultaneously, with one movement of the locomotive, a “kick back” or “flying switch” was executed, sending the box car down the main line, the three flat cars down track No. 2, and the six gondola ears down the “government” track, and over the crossing where the accident took place.
 

 There was a- brakeman at each of the switches to throw the switch. One of these got on the flat cars for the purpose of stopping them at the right place on the mill track. The brakeman who threw the
 
 switch
 
 where the mill track branches off from the “government” track, after sending the gondola cars down the latter track, walked back in the direction from which the cars were coming, and boarded the rear end of the rear car, where he was when the collision happened. It appears that the south end of the track in question runs up grade, and the switchman followed these cars in order to set the brakes at the proper time in order to prevent the cars from rolling backwards. There was no one on the forward car, and the brakeman on the rear end of the string of ears did not see the accident. Neither was there a flagman at the crossing.
 

 The truck was not equipped with a self-starter, and had to be cranked in order to start the motor. The driver’s seat was on the left-hand side of the vehicle opposite to the side from which the cars appeared. Having stopped, looked, and listened, the driver, when he again put the truck in motion, was occupied in driving safely over the crossing, and did not look further to see if any cars were approaching.
 

 The Court of Appeal found that the accident and consequent injury of the plaintiff was caused by the negligent handling of the train and cars by the employees of the defendant company. In this we agree. But the court further held that the plaintiff could not take advantage of the negligence of ■ the defendant company, and denied him any recovery, because of his contributory negligence - in failing to “shut off” the motor of the truck which was making such a noise that it was impossible for him to hear the cars which were approaching the crossing. In this we do not agree.
 

 “Contributory negligence in its legal significance is such an act or omission on the part of plaintiff amounting to an ordinary want of care, as concurring or co-operating with the negligent act of defendant, is the proximate cause or occasion of the injury complained of.
 

 “An essential requirement is that the act of the person injured must be a negligent act. It is not sufficient merely that the act contributes to the injury, as it is the contributory negligence and not the contributory act which defeats recovery. And further, such negligent act must be in some sense the act of the person injured; neither his own or that of some one whose negligence is legally attributed to him.” 29 Cyc. pp. 505, 506.
 

 “Ordinary care is such care as an ordinarily prudent person would have exercised under the same or similar circumstances to avoid danger.” 29 Cyc. p. 512.
 

 We do not think the plaintiff was guilty of want of ordinary care in permitting the motor of his truck to idle during the time the vehicle was at rest in order that he might look and listen for approaching trains
 
 *879
 
 or cars. The only listening exacted of him by law was such listening as would enable him to hear the ordinary and customary signals and noises of approaching trains. He not only listened, but he was in a position to hear the usual warnings and noises of such trains. The cars in question were shunted over the crossing without any effective signal or warning being given of their approach, and they rolled along, more or less silently, under their own momentum. This occurred amidst the innumerable noises connected with the operation of a sawmill plant.
 

 The noise of the idling motor was not unusual and no greater than the noise customarily made by such motors in the same situation. It is true that when the motor was accelerated preliminary to crossing the incline over the railroad track it made some “fuss,” but this was not during the time the truck was stationary and its occupants were looking up and down the track. We do not find any testimony showing, directly or by inference, that the noise of the motor prevented plaintiff from listening or hearing the approaching ears.
 

 It was necessary to crank the motor in order to start it. Therefore, if plaintiff had stopped it, in order to listen.more intently, either he or his fellow occupant of the truck would have had to dismount and recrank the motor, then return to the truck with the motor running before attempting to cross the track. In this situation the legal effect would have been the same as the one actually presented in the case. If this rule were to prevail, it is difficult to perceive how drivers of trucks in the predicament of plaintiff could cross a railroad track at all. In any event, if a driver of a truck be required to stop his motor, descend from his seat, crank the motor, return to his seat and put the machine in gear, he is more likely to find himself in trouble in attempting to cross a railroad track than if he is not required to undertake these various movements.
 

 In the Court of Appeal, plaintiff filed an answer asking that the award of the district court be increased. Here he has renewed his request, which he has supported by an earnest argument in his brief. Plaintiff undoubtedly was seriously injured and incapacitated, but in cases of this kind much discretion is left to the trial judge, and his award will not be disturbed unless manifestly erroneous. Our examination of the testimony has led us to the conclusion that his allowance is sufficient.
 

 For the reasons assigned, the judgment of the Court of Appeal is set aside, and the judgment of the district court is reinstated, and affirmed.
 

 OVERTON, J., recused.