PEART v. THE ORLEANS-KENNER
TRACTION CO.

(March 12, 1928.   Opinion and Decree.)
(April 23, 1928.   Rehearing Refused.)
(June 15, 1928.   Writ of Certiorari and
Review Refused by Supreme Court.)

A. V. Coco, of Marksville, Peterman, Dear and Peterman, of Alexandria, Guion and Upton and Wm. M. Ogden, of New Orleans, attorneys for plaintiff, appellant.

Ben W. Kernan, of New Orleans, attorney for defendant, appellee.

WESTERFIELD, J.   Plaintiff sues as natural tutrix of her minor son, Lewis Chase. She is joined in the petition by her husband, Leon W. Peart, co-tutor. The petition alleges the negligent killing of Lewis Chase, the father of her minor son and former husband of petitioner by the defendant's employees on November 19, 1920, and prays for damages, as follows:

(1) Expense of last illness............$   650.00
(2) Value of automobile ............... 3,000.00
(3) Physical pain and injury suf-
      fered by deceased from Nov.
      19th, the day of his injury,
      to Nov. 24, the day of his
      death ............................................ 5,000.00
(4) For loss to the minor of his
      father's care, rearing and
      general helpful companion-
      ship ................................................ 25,000.00
                                                          ─────────
          Total........................................$33,650.00

The accident happened at 7 a. m., at a grade crossing on the line of the defendant's interurban railroad at a point about 10 miles above New Orleans. One of the cars of the defendant collided with an automobile driven by deceased, injuring him severely and resulting in his death.

The negligence imputed to defendant consists in its alleged failure to give proper signals in approaching the crossing and reckless speed. Defendant denies all fault and pleads contributory negligence.

It is established by the testimony of the other occupants of the car he was driving that deceased stopped, looked and listened

and that neither he nor they saw or heard the approaching car. The evidence as to signals given by the electric car is conflicting. The car was equipped with a bell and a whistle. The motorman claims that he blew the whistle three times within a distance of 300 feet of the crossing, the last time just before the impact. Another witness says he heard the whistle, but it sounded as from a great distance. No attempt was made to sound the bell.

The speed of the electric car, about 16 miles per hour, was not excessive under normal conditions and in a different locality. The conductor testifies he was running on schedule time having maintained his schedule from New Orleans to the scene of the accident, Highland Farms crossing, a distance of 12 miles. But normal conditions did not obtain. There was a dense fog, which materially affected the sight and to a lesser degree the hearing. The motorman said: "It was so foggy I couldn't see over 10 or 15 feet away." Other witnesses claim a greater degree of visibility than the motorman but it is conceded in the answer and otherwise that a thick fog enveloped the surroundings. Was it sufficient under the circumstances prevailing for the defendant to operate its cars with the usual care and at the usual speed, is the question presented for our determination.

In the first place a grade crossing, being more dangerous than other crossings, necessitates greater care on the part of the carrier.

"Grade crossings are as a rule more dangerous than crossings above or below grade and the company (R R Company) is held to a greater degree of care in the operation of its trains at such crossings than at those where the highways are on a different level." Elliott on Railways, 3rd Ed., Sec. 1576.

"At street intersections and crossings there is a special reason for keeping a lookout, giving signals or warnings, and having the car under control." Supra, Sec. 1533.

After striking the automobile, the car proceeded some 70 odd feet before coming to a stop. It is apparent that it was not under control and that its speed had not been materially checked before the accident.

This particular crossing was unusually dangerous because, just before the crossing there was a large bend or curve in defendant's track, estimated by the witnesses from 500 to 100 feet long. Defendant's conductor testified to both the maximum and minimum length of this curve at different points in his evidence. Whatever may be its dimensions it created an extra hazard and involved additional responsibility:

"If a railroad company, in the management of its traffic, causes unusual peril to travelers, it should meet such peril by corresponding precautions. So, where the crossing is especially dangerous on account of its locality or mode of construction, or because the view is restricted or the track is curved, it is the duty of the company to exercise such care and take such precautions as the dangerous nature of the crossing requires." Eichorn vs. N. O. & C. R., L. & P. Co., 112 La. 236, 36 So. 335.

The degree of care which the law exacts of carriers, differs with the circumstances prevailing, and increases as the conditions become more dangerous. What would be sufficient precaution in one situation may not suffice in another:

"The parties in charge of a railroad train do not perform their whole duty, under all circumstances, by pursuing the regulation method of giving notice by the ringing of a bell, or following out any prescribed mode of giving warning. The precautions

to be adopted and the steps to be taken in aid of safety increase as the danger is increased, and their sufficiency is to be gauged by what is called for by the circumstances of each case." Downing vs. M. L. & T. & S. Co., 104 La. 507, 29 So. 207.

A heavy fog prevailed. Fog constitutes the greatest menace of transportation whether upon land or sea and is the most feared of all perils that confront the traveler. The "pea soup" fogs of London are notorious for causing confusion and disaster in connection with pedestrian and vehicular traffic. Science, which in so many instances has relieved, or allayed, or mitigated the difficulties which beset, and ills, which afflict mankind, seems helpless and hopeless in this particular, and has contributed nothing with which to combat this terror of transportation. To one who has been at sea, as has the writer, during the prevalence of a dense fog for some forty-eight hours, and observed the anxious expression of the navigator, his ceaseless vigil upon the bridge of the ship, the constant blasts upon the primitive fog horn, the sole protection relied upon, and has witnessed the depression of the passengers and crew, no further demonstration of the danger of fog is necessary.

In the case of The Martello, 153 U. S. 64, it was held that a speed of six miles per hour is excessive for a steamer emerging from New York harbor in a dense fog.

In an English case it was held negligent for a boat to move at any speed in a dense fog. The Girolamo, 3 Hagg. Adm. 169.

Excessive speed by vessels in a fog will not be excused even though answering a cry of distress, and on a life saving errand. The Nacoochee, 137 U. S. 330.

In the last cited case the rule of the sea is stated to be, what has often been held with respect to the land:

"She, (the vessel) was bound therefore to observe unusual caution and to maintain only such a rate of speed as would enable her to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog. This is the rule laid down by this Court in the case of The Colorado, 91 U. S. 692."

In Clements vs. T. & P. R. R. Co., 148 La. 1050, 88 So. 394, the court held that the blowing of a whistle by a backing train more than eight car lengths from the crossing at night was not sufficient warning of danger at the crossing.

In running at the usual speed the motorman could not stop his car within the range of his vision, which he says was only 15 feet. He was approaching a grade crossing on a bend or curve in the track in a dense fog without ringing his gong. The curve, the grade crossing and above all, the fog were circumstances, which imposed the obligation of unusual care and caution, necessitating the use of every warning device. The whistle, if blown as claimed, was not sufficient, and the evidence creates serious doubt as to when and how it was blown. We are convinced that the speed of the electric car was immoderate under the circumstances and constituted negligence on defendant's part.

Contributory negligence is pleaded. As we have observed the record establishes that the deceased stopped, looked and listened, before crossing the track. It is contended that he either saw or should have seen, heard or should have heard the electric car. To suppose that he saw or heard and continued on his way is to assume an intention to suicide or a state of imbecility. As to whether he should have seen or heard and therefore his failure to do so was equivalent to not looking

or listening under familiar principles of law, we observe that this rule has no application when surrounding circumstances excuse or prevent his failure to see or hear. Huddy on Automobiles, 8th Ed. Sec. 716; Lofters vs. Pacific Electric Co., 156 Cal. 464.

"If the driver of the hearse stopped, looked and listened when he reached the crossing and before going upon the first track, and did not see and could not see any approaching train and did not hear and could not have heard any signal or noise of a moving train, we are unable to see how the driver could be legally charged with contributory negligence." Betz vs. I. C. R. R., 161 La. 929, 109 So. 766. See also Townsend vs. Mo. Pac. R. Co., 163 La. 872, 113 So. 130.

In the case at bar the driver of the automobile was prevented from hearing or seeing the car because of the fog prevailing, or possibly the curve in the track, or more probably both. In any event we are convinced that he can not be legally charged with a fault which contributed to the accident.

As to the quantum. Deceased was 30 years old, and earning $60.00 per week. His life expectancy was 35 years. His automobile costing $2800.00 was demolished, though its value at the time of the accident is uncertain.

At the time of the trial in 1925 the minor, plaintiff, was ten years old. He had lived with and been supported by his mother, since he was two years old, at which time his parents were divorced. His mother and tutrix remarried in 1918 when he was three years old. These circumstances must be considered in abatement of the damages claimed.

Without particularizing we will allow for all items of damage to which plaintiff is entitled $9,000.00.

It is therefore ordered that the judgment appealed from be reversed and it is now ordered that there be judgment in plaintiff's favor and against defendant, as prayed for, in the sum of $9000.00.