No. 12,872.

JOHN KRAMER VS. NEW ORLEANS, CITY & LAKE RAILROAD COMPANY.

SYLLABUS.

51 1689
105 427

51 1689
111 792

51 1689
114 1079

The plaintiff in a suit for damages against a railroad company for injuries caused by defendant's car running over him, shown to have been alongside or in a position close to the track, with his legs across the nearest rail, and in that condition receiving his injuries, must, in order to recover, show with

reasonable certainty that notwithstanding his gross imprudence in thus exposing himself to peril, the defendant's motorman could, by the exercise of ordinary care, have averted the accident. 2nd Thompson on Negligence, 1105, §1, pp. 1157, 1158; Pierce on R. R., p. 330; Patterson's R. R. Accident Law, pp. 51, 55, 61; 144th U. S., 439 and line of authorities there cited; McGuire vs. R. R., 46th Ann., 1543.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*Fenner, Henderson & Fenner,* and *O. B. Sansum* for the Plaintiff and Appellee.

*Denegre, Blair & Denegre* for the Defendant and Appellant.

Argued and submitted December 7, 1898.
Opinion handed down January 9, 1899.
Rehearing refused June 27, 1899.

The opinion of the court was delivered by

MILLER, J. The defendant company appeals from the judgment condemning it to pay damages for the injuries caused by one of defendant's electric cars running over plaintiff, he being asleep, or unconscious, lying near the tracks of the defendant, with his feet extended over the rail, the accident resulting in the amputation of his legs below the knees.

The petition alleges that plaintiff, crossing the tracks, stumbled and fell prostrate; that unconscious and helpless, he lay there until run over by defendants' car, with the result of the loss of his legs below the knees. In the further statement of the case in the petition, it is averred "that plaintiff's body lay alongside the railway, with both his legs resting on the nearest rail, plainly visible for one hundred and fifty feet from the platform of the defendants' car," to where the plaintiff lay, and the petition charging the accident to be due entirely to the want of the least degree of care and attention "on the part of the motorman in charge of the car, permitting it to continue in motion and to run over the plaintiff's legs," claims damages in the sum of fifty thousand dollars. The defendant excepted that the plaintiff had settled and compromised his claim, and plaintiff, by supplemental petition, averred the compromise was obtained by fraud. The defend-

ant answered, pleading the general issue, and alleging plaintiff's negligence to have caused his injuries. From the judgment based on the verdict of the jury for twelve thousand five hundred dollars, this appeal is taken.

Without detailing the testimony on the point, mainly that of the plaintiff, we reach the conclusion the plaintiff was helplessly drunk, and in that condition lay on the ground near the track. He was seen by the motorman of a passing car, a short time before the accident, "asleep four feet from the track, face towards the Bayou St. John, his legs towards track." Taking the allegation in the petition, that he stumbled and fell, lay unconscious and helpless, with the testimony that he had been drinking; and with no other explanation of his stumbling and helpless condition, in our opinion, we have the case of a drunken man lying near a railroad track, throwing his legs across the track, or rather that portion of the leg below the knees, the amputation having been near the ankle joint, and in that condition receiving the injuries from the passing car for which he claims damages in this suit. This part of the case, we think beyond the reach of controversy. The motorman who first perceived plaintiff, testifies, as soon as he reached the "barn" of defendants' company, he notified the foreman that the plaintiff was lying near the track in a dangerous position, and that the foreman then sent one of the conductors to get plaintiff out of the way. It is controverted by plaintiff that the foreman took this action, but we have his testimony that he did, besides that of the conductor bringing the information. This "barn," as it is called, is about three squares from the place where plaintiff was seen lying, and it is apparent that but a brief period would suffice for the car to reach the barn after passing the plaintiff. Brief as was that period, and the time required for the man sent by the foreman to reach the plaintiff, it nevertheless appears that the precaution to which the foreman testifies, was ineffective. The accident occurred within a very short time after the plaintiff was first perceived, the foreman testifying that when the man sent by him was but twenty-five feet away on his mission, the alarm was given that plaintiff had been run over; and on proceeding to the spot, he was found with his legs crushed. Near the point where the accident occurred, the railway track curves from Esplanade street into Moss street, on the west side of which is the Bayou St. John. The car that ran over the plaintiff, proceeded down Esplanade street, entered this curve, reached the other end, and proceeded on its course

on Moss street to where plaintiff was lying. From the end of the curve it is seventy-seven feet to the point the witnesses call the second trolley post; the first standing where the car comes out of the curve. On the Bayou side of the track, when the accident occurred, there was a wood pile between the first and second trolley post; the pile being close to the track and occupying a space of say four or five feet in length, by a width of four feet. There is some variance in the testimony as to the distance of the wood pile from the second trolley post, and the witnesses differ as to the space between the pile and where plaintiff lay, but there is no question he was lying between the pile and the second trolley post, within less than seventy-seven feet of the end of the curve. It is shown that at the place of the accident, there was grass alongside and extending to the rail, and with due allowance for the differences as to the height of the grass, we think it established the grass was about a foot high, sufficient, we think, to affect the discernment of the motorman to discover the plaintiff's legs on the rail, whether that vision is exerted at the end of the curve or at its beginning. With the best consideration, we cannot resist the conclusion, that the grass, as well as the intervening wood pile, must have appropriate weight in solving the question of the motorman's diligence in not perceiving, when the car was, say seventy-five feet away, the plaintiff, lying in the grass, along side the track, with his legs, or more properly, his feet, on the rail. There is no testimony when or how plaintiff fell, beyond his own account that he stumbled, remaining unconscious until run over, but we have the positive testimony of his position not on the track at all, but near it, a very short time before the accident, when he was passed by the car preceding the one that ran over him. It is the irresistible conclusion that in the brief period or moment, between the time he was first seen and the accident, and while in a condition of utter incapacity to appreciate his danger, the plaintiff changed his position and rolled his legs on the track. If we were at liberty to assume he thus disposed of his limbs at the precise moment of time the car came within the scope of the vision of the motorman, and if we adopt the curve end on Moss street, or, if it were allowable, even the beginning of the curve on Esplanade street, as the point the vision of the mortorman should have been exerted, there is in the record the very clear testimony founded on actual observation and experiment, with the electric cars on this road, that the car coming out of this greased curve could not have been stopped within the dis-

tance from the curve end to where the plaintiff lay, and it is our conclusion, could not have been stopped, within the distance from the beginning of the curve to the plaintiff, even if we could hold that the motorman could have seen the plaintiff before or at the moment the car entered the curve on Esplanade street. That in the stupor incident to drink, the plaintiff placed his foot on the tracks, and that this point of exposure must have been within a distance from the curve, that an electric car would pass in a few seconds, is established with all reasonable certainty, is with the other testimony of obvious force on the issue whether the car could have been stopped in time to avert the accident, and is of equal pertinence on the general proposition asserting the liability of defendant, that is, notwithstanding the plaintiff exposed himself to the peril, the defendants are chargeable with negligence, culpable to the extent of imposing on the company liability for the accident, because it is charged the motorman should have perceived plaintiff in time to admit of the preventive steps which it is claimed if employed in time, would have averted the accident.

We are met by the preliminary question whether the defendants can ask this court to review the decision based on the verdict of the jury, the defendant not having asked for a new trial. We cannot hold that the constitutional right of appeal is lost, because the appellant has not sought a new trial in the lower court. Our jurisprudence deservedly attaches weight to verdicts of juries on questions of fact, but we do not understand that a judgment based on a verdict, not sought to be set aside, is therefore not to be reviewed in this court on the appeal. We presume the argument addresssed to us is designed only to enforce the weight due in this court to jury verdicts on issues of fact. The line of authority in that direction is too familiar to need citation, and in our examination of this case, we have not been unmindful of the influence ascribed to jury verdicts.

The defendant relies on the palpable imprudence of the plaintiff as a bar to any recovery. The general rule that contributory negligence of the plaintiff in a suit for damages for personal injuries will defeat his action, requires only the statement. The plaintiff concedes it, but claims his case is within the qualification that even if there is contributory negligence of the grossest kind on the part of the plaintiff, his recovery will not be defeated, if there has been a plain disregard of that ordinary care on the part of defendant, that if exerted, would have averted the accident, causing the injuries for which damages are

sought. The qualification, variously stated in the text books and affirmed by decisions, is as well settled as the rule itself, of which the qualification may be deemed part. Our courts, like others, have had occasion to apply the qualification, and we have expressed it substantially as it is laid down in decisions and text books. 2nd Thompson on Negligence, p. 105, S. 1, p. 1106, S. 11, p. 1157, S. 8. Pierce on Railroads, p. 360; Patterson's Railway Accident Law, pp. 51, 55, 61. Grand Trunk Railway Co. vs. Ives, 144th U. S., 429; McGuire vs. Railroad, 46th Ann., 1543, and the line of authorities to which our attention has been directed by defendant's counsel; 104th Ala., 241; 49th Ohio State, p. 230, and similar type. The substantial question in the case is whether the plaintiff has brought himself within the qualification that relieves him from the effect the law and reason attaches to that reckless imprudence on his part so conspicuous in the record connected with the injuries, for which he claims the defendant should compensate him, and to this part of the case our earnest attention has been directed.

It is charged that defendant is liable, because when the foreman was apprised by the motorman of the car that passed the plaintiff, that he was lying asleep in dangerous proximity to the track, it is claimed the foreman did not take the precautions required to secure the plaintiff from danger. Passing over the question as to the duty or character of the diligence imposed on defendant by the communication of plaintiff's danger to their foreman, we can find no basis for the conclusion that the foreman did less than humanity suggested, or was required of him, by any test we can apply. His testimony is, he at once instructed one of the conductors within his call, to proceed to the spot and remove the plaintiff, but before the mission could be executed, the accident occurred. It is true the conductor to whom it is claimed the order was given, testifies he was sent on some other business. Assuming he was the same conductor to whom the foreman spoke, we have against any force of the conductor's testimony, that of the foreman, confirmed by that of the conductor who communicated the plaintiff's danger, that the communication was at once acted on by the foreman, and that the conductor charged to remove plaintiff from the position of danger at once, proceeded on his mission, but before he got a few feet away, the alarm came that the plaintiff had been run over, verified as soon as the foreman and conductor, with others, reached the scene of the accident. With the closest scrutiny and con-

sideration of the testimony on this part of the case, we can perceive no basis to charge the company with liability for the injuries to which the plaintiff exposed himself.

On the part of the case that is supposed to exhibit the negligence of the motorman, because he did not sooner perceive plaintiff and employ the requisite precaution, we have been unable to appreciate and give effect to the argument addresssed to us on behalf of the plaintiff. The distance between the point where the curve ends on Moss street, and the place where plaintiff lay, making all possible allowance for variances in the testimony of witnesses, is certainly less than seventy-seven feet. It is insisted that plaintiff should have been perceived earlier, that is, while the car still on Esplanade street, was entering, or, at least, before it reached the curve end. If we could hold that the motorman is chargeable with negligence, because entering a curve, where, too, there was a crossing for pedestrians, and we presume for vehicles, requiring the attention of the motorman to be given to the curved track in his front, he did not look for plaintiff's legs on the track beyond the curve, and more than seventy-seven feet from the curve end, the plaintiff's case would still encounter the difficulty presented by the testimony of the time required to stop the car moving through the greased curve and coming out of it with the speed usually employed. It is testified with great distinctness, as based on actual experiment, that the car that ran over plaintiff could not have been stopped within from 100 to 130 feet; that the best result, to use the witness' expression, obtained in the efforts to stop the car, used to ascertain how soon it could be stopped, gave 150 feet as the distance within which that stop could be effected. Our conclusion puts plaintiff within less than one hundred feet of the beginning of the curve. With an electric car traversing one hundred, or even one hundred and fifty feet in a few seconds, we should encounter serious difficulty in holding the company liable, because the car was not stopped at the curve end, or at the beginning of that curve, and we would experience, perhaps, greater difficulty in holding that negligence is to be attributed to the motorman, because he did not perceive the plaintiff lying in the grass, with his feet on the track, even if we could adopt as the point when the motorman's vision could or should have been exerted, the beginning of this curve within, we conclude, one hundred feet of the resting place plaintiff had selected, close to the track and with his feet on the rails.

This is not the case of a man prostrate or falling on the track in full view of an approaching car, and with ample time to arrest the car. On the question of the diligence, to be exacted of the motorman, it must be borne in mind the plaintiff is lying along side of the track in the grass, no part of his body on the rail except the lower parts of his legs, or more properly, his feet, on the rail. In determining the discernment of the motorman, in respect to this position of the plaintiff, we must take into account the grass, the intervening wood pile, besides the distance of the plaintiff from the curve. Are we to hold that the motorman entering the curve on Esplanade street, was required to closely scan the rails beyond the curve to discover the protruding feet of a man in the grass, seventy beet beyond the curve? It would have been prescience for a motorman to suspect or anticipate or realize at once what was on the track if he had or could have seen, the plaintiff's feet, on entering or coming out of the curve. The presumption is the track is clear, not that this at all releases the vigilance to be exerted by the motorman, but in estimating that vigilance surely some allowance is to be made if the motorman did not at the moment of time it is claimed his vision should have been exerted, perceive the plaintiff's feet, in that appearance they exhibited at a distance of seventy feet from the curve end, or that greater distance from where the curve begins. On this part of the case our attention is directed in the argument to a test claimed to furnish conclusive evidence the plaintiff should have been discovered in time to have saved him from injury. A handkerchief brought up with the record, was placed on the track at the place the defendant received his injuries, and the witness who put the handkerchief in position testifies he could see it from a step more distant than the curve. The argument implies that while entering or passing through the curve, the eyes of the motorman should have been cast on the rail beyond the curve to discern the feet on the rail of the man in the grass; or the implication of the argument is that quickly on coming out of the curve, an appearance on the rail at the distance shown by the record, should have been realized as the feet, however extraordinary and unexpected such a position for a man to place limbs or feet, and the test of plaintiff is supposed to support the argument. But it must occur that the quickness and accuracy of perception of the man who put the handkerchief on the track and who then seats himself to look for and perceives the object he had thus placed in position, is not to be expected of the motorman with no cause

to suspect, still less, to know the object presented in that appearance claimed to have been within the scope of his discernment at that distance the argument claims his vision should and could have been exerted. In our view to exact any such vigilance as is claimed in the defendant's argument would be to exceed the bounds of reason.

Again, the plaintiff, to fix on defendants the responsibility for this accident, must show with reasonable certainty that his injured limbs were on the track, at that point of time when it is claimed, preventive measures should have been employed and would have been effective. On this part of the case his proof fails. But a short time before he was run over it is in proof no part of his body was on the track. When the movement was made by which his legs or feet were thrown on the track is left without proof. It may well have been that the plaintiff did not place his feet on the track, until the car was too close to avert the accident. In that contingency the defendants would certainly have been free from responsibility. To charge the company with liability we must assume the fact on which that liability depends. That assumption we cannot supply.

In all aspects of the case, in our opinion, the defence must prevail.

It is therefore, ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed, and it is now ordered, adjudged and decreed, that plaintiff's suit be and is hereby dismissed, with costs.

NICHOLLS, C. J., absent.