# Montgomery Light & Traction Co. *v.* Baker.

## *Injury to Passenger.*

(Decided November 7, 1914.   Rehearing denied December 17, 1914.
67 South. 269.)

1. *Street Railroads; Injuries; Head Lights.*—It is negligence as a matter of law for a street car company to operate a car in the night time with a head light without sufficient capacity to cast a light upon the track so as to enable the motorman to perceive objects upon the track for the distance within which the car can be stopped, or for the motorman to run his car at such a rate of speed as to be unable to stop the car with the aid of the appliances which he has within the distance within which by the aid of the headlight, he can see an object upon the track.

2. *Same; Acts of Motorman in Emergency.*—Ordinary care on the part of the motorman require that in an emergency to prevent in-

jury, he shall act with that high degree of diligence with which a reasonably prudent man in the possession of all his faculties, and knowing what to do, would be expected to act under similar circumstances, and if the emergency requires that he quickly stop the car, he must use such of the appliances at hand as a reasonably prudent man, skilled as a motorman, would, under similar circumstances, be expected to use, and must do so with the same degree of celerity that a reasonably prudent man skilled in such business would, under similar circumstances, be expected to display.

3. *Same; Discovered Peril.*—One drunk or in any way disabled on a street car track, may recover for any damages inflicted upon him by a street car, if the motorman saw him on the track in time to prevent the injury, and negligently failed to use the precautions which a reasonably prudent man, skilled as a motorman, would be expected to use to prevent injury.

APPEAL from Montgomery City Court.

Heard before Hon. GASTON GUNTER.

Action by M. G. Baker against the Montgomery Light & Traction Company for injuries received while attempting to board a car. Judgment for plaintiff, and defendant appeals. Affirmed..

RUSHTON, WILLIAMS & CRENSHAW, for appellant.

RIDDLE & ELLIS, and WEIL, STAKELY & VARDAMAN, for appellee.

DE.GRAFFENRIED, J.—The plaintiff, a stranger to Montgomery, was injured by a street car of appellant, and brought this suit to recover damages for the injuries which he thus received.

It appears from the plaintiff's evidence that in the city of Birmingham street cars are boarded from the right side; that the plaintiff knew that fact; but that he did not know from which side a street car is boarded in Montgomery.

The plaintiff testified that he came into Montgomery during the afternoon; that his brother-in-law lived in Montgomery, but that he did not know the place of his residence; and that he finally ascertained that he lived

out near the end of the street car line on Court street, which is one of the principal residence streets of Montgomery. Continuing his testimony, the plaintiff said:

"I was on the corner waiting to catch a car back to town, and had been sitting there some little time. I had decided to catch the first car that came along, as none seemed to be going my way. I was about one block from the end of the car line, thought the rules in Montgomery were like those in Birmingham; that is, that you had to be on the right-hand side of the car before they would notice you at all. I went across the track, and in doing so my left foot hung in the rail and threw me down. I made several hard lunges to get my foot out, but the car was coming so fast that I decided right quickly that I had rather have my leg cut off than to be killed, so I crawled back on the same side my foot was hung on, and just as I got my body over the rail I pullel out and raised up against the rail to pull myself on up and get out of the way. I got my arm over except a part of my hand, and at that time the car struck me. Two of my fingers were cut off, and another was mangled so that it is of no service. I was scarred over the nose, my chin fractured, and my head bruised so that it has no feeling in it all on this side, and I was bruised considerably. I don't know what happened after the car struck me. When I next realized the car had struck me I was in St. Margaret's Hospital, something like two weeks after the accident. * * * When I started across the track the car was about two blocks from me—down near the curve. I was on South Court street, where the car goes to the end of the line, and on the right-hand side of the car if it had been going to town; in other words, on the left side of the street, or the east side of the street. The car was about two blocks away, and I started to cross to

the right-hand side. I fell headlong when I struck the first rail, the rail on the east side. One of my feet was free when I fell, but the other was hung in the rail. When the car came in sight I was counting my change to see how much I had, and was sitting on the curbing on the street. My change was in my hat. I was looking at the car—had the hat and change in my hand looking at the car and flagging the car. When I fell I first tried to get my foot out, but couldn't do so, but before the car hit me I got all my body and limbs outside the track except my hand, and my body lay along and outside of the rail, facing the car. From the way I could judge the car was coming about 15 miles an hour, uphill, from the time I saw it until it struck me. The track was straight for about two blocks. The car was coming around the curve when I first saw it. The blocks were about the average city blocks. There were electric lights around where I was struck—one on the corner down below, the next street, and one—I don't think I was further than 30 feet from the nearest electric light, and there was no obstruction between me and the street car, and when struck I was on a public street in the city of Montgomery. * * * I had been in town just a short time, having arrived on the morning of the accident, I think. I arrived in the city on the evening of the accident. I came to Montgomery from Selma. I don't know exactly what time I got here. I don't remember exactly whether it was morning, evening, afternoon, middle of the day, or when. I don't know the exact time when I left Selma. I was not on a spree. I left Selma about 10 o'clock in the day. I don't remember; I can't say when I left Selma; I had no watch. It was some time in the morning when I left there. I had been in Selma something like an hour, having come

to Selma from my home at Shelby Springs. I don't remember what time I arrived at Selma. I was hurt on the 26th of March, and left home on that morning. I don't know exactly what time it was. I took the train at Shelby Springs, in Shelby county, a few miles east of Calera, for Selma, in the early part of the morning. I went to Selma looking for a job, and stayed in Selma about an hour. While in Selma I went to the Southern offices. I got to Montgomery about 3 o'clock in the afternoon. I got off at Union Depot and tried to locate the trainmaster of the Louisville & Nashville. In trying to locate the trainmaster I went to the hotel the first place. Up to that time I had not had any drinks; that is, until after I saw the trainmaster. Between that time and the time of the accident I had two drinks, all by myself. I saw the trainmaster about 3 o'clock. I left Selma about 10 o'clock. I got on a through freight at Shelby Springs and went to Selma. It was about 65 miles from Shelby Springs to Selma. I worked on the Southern two years. I started out to find my brother-in-law about 7 or 7:30 o'clock, and got hurt about 9 o'clock. * * * The car was about two blocks away when I started across the track, and in crossing I got my foot under the rail and fell headlong across the track. I made several hard lunges to get out and jerked my left foot. I saw that I could not get loose that way, and decided to crawl back over on the side that my foot was hung on and let it cut my leg off rather than kill me. At that time my foot was under the track. I crawled back and got my body off of the rail. My leg twisted out just before I got my body over the rail. When I was struck by the car I was laying up and down the rail having just crawled across the rail. The car was coming fast at the time I started across

the track. At that time the car was about two blocks away and I fell when I started to cross the track. The street lights was at the crossing, I reckon about 30 feet away. I was this side of the crossing next to the car. I don't know where my brother-in-law worked, and made no attempt to find him until 7 or 7:30 o'clock. I also inquired for him at the Exchange Hotel. He married my sister. My sister at that time was at my home. I don't know how old he is. He has been here but a few months. From 3:30 o'clock until 7 I was walking around the street. The hotel clerk told me where my brother-in-law was. While waiting on Court street for the car, I decided to take the first one that came along regardless of which way it might be going, because I knew that it would eventually bring me back to town. That is why I started to take an outgoing car."

The motorman in charge of the car which struck the plaintiff testified for the defendant, in substance as follows: "The car had a strong headlight on it. The company at that time did not have two kinds of headlights. I am working for the street car company now, and have been with them since the accident. The car was in good condition that night, and was equipped with reverse lever and brakes, both of which were in good condition, but I cannot say first-class condition, and I was keeping a lookout all the time. It was upgrade. The night was dark. The reverse lever was in perfect condition. The headlight did not shine very far, but you could see the rail, but could not see the ground. It was not a very good light, but I could see the rails. The light did not shine like an arc light, but did shine like those on street cars and was as good a light as the street car company had. I knew what kind of light it was and how far I could see ahead of the car. I don't

suppose the car was going over 8 or 10 miles an hour. Going up that grade I don't know the exact distance I could stop the car within when going 8 miles an hour. Going up that grade I probably might or might not, by the use of the reverse, be able to stop it within half a car's length. As soon as I saw the plaintiff I shut the power off and put on the brakes as quick as I could. I did not have time to reverse the car. I had my hand on the brakes all the time. There is not much difference in time that it takes to apply the brakes or the reverse. The car was probably 30 feet long. Going 15 miles an hour up that grade, I could stop the car as soon as anybody could, but I do not know what would be the shortest distance in which it could be stopped. I suppose 2 or 2½ car lengths, and that was about the distance I ran after the car struck him. The light from the car did not shine very far ahead of the car—probably about 12 feet. With all the stopping facilities that I had on the car and that I used, the car ran 2½ lengths past where the plaintiff was. The light did not shine away ahead of the car. It shines downward, and some of the lights are better than others. This light was like the others, and shone as well as any of them, so far as I know. It had a reflector; probably threw light 16 feet. The reflector was made of tin, and was of oval shape. I was not thinking about whether I could stop as we were going uphill, and was not paying attention as to how fast I was running, but I was looking ahead all the time, and knew that I could see about 12 feet ahead. I could hardly have stopped within 12 feet, no matter what was on the track; that depends on whether or not one has the presence of mind to reverse as soon as he discovers some object on the track. I stopped the car as quickly as I could, and that

was in about 2½ car lengths. That was as quick as I could stop it with the brakes. I did not reverse it. The plaintiff was sitting flat on the ground, and the top of the rail is 2 to 3 inches higher. There are no cross-ties. There was an arc light on the street above the place where the accident happened. The accident happened about the middleways between two arc lights—between two streets. The streets are probably 150 yards apart, and there is a shade tree opposite where the man was sitting. When I first saw the plaintiff he was kinder humped up. He seemed to be piled up like a drunk man. If the car had been going 30 miles an hour, I could have stopped it somewhere at the end of the line, over a block away. I don't know how quickly I could have stopped it if it had been going 20 miles an hour; probably 20 or 30 steps—60 or 90 feet. The reverse is more effective if the car is not going too fast, and going 8 miles an hour the reverse should stop it quicker than the brakes, and the same if it were going at 10 miles an hour. So far as I know, the reverse was in good condition that night. I took hold of the man and straightened him out, and smelled whiskey on him. He was laying up and down the track, within 2 feet of the track. He had his fingers cut off, and there was a gash on his head. I undertook to stop the car when about 12 feet away, when I could see whether it was a man or not, but I run 12 or 15 feet from the time I saw him until I saw he was a man. As soon as I discovered that it was a man, I did everything I could to stop before I ever struck him, and did everything I could to keep from killing him. I had not done anything to stop the car until I saw him. When I first saw him, he was probably 12 or 15 feet away, and I ran a few feet before I could decide that he was

a man. I tried to stop the car as quickly as I saw him near the track. I could not tell that he was a man until I was right close to him. I put on my brakes as soon as I discovered something on the track. The headlight shines more if it is cleaned up. It did not look as if it had been cleaned up. The glass in front of the light was dirty. The lights on the Pickett Springs line are not made to the car. They are set on there. You can change them from one to the other. The smaller lights are made on the car, and the company runs big lights only on the Pickett Springs line. When I saw the plaintiff he looked as if he had been knocked on the head and laid on the track. The blood was still clotted. He was not on the track, but by the side of the track, and close enough to be struck. I thought he had been knocked on the head, because the blood had clotted on his face—not dry, but clotted on his hands and shirt. The conductor and I and another man saw this. At first I thought the step hit him, but I did not think the blood could have clotted in less than 30 or 60 seconds. The blood was dry. There was fresh blood on his face, and he was unconscious. I did not hit the man on purpose, and the car did not have air brakes on it. Air brakes stop the car quicker than the brakes I had. We have air brakes only on the double-truck cars, and this car was a single-truck. The man was not on the track, but was probably a foot or more from it."

The above testimony gives, substantially, the facts upon which the case was tried, and upon which facts the verdict of the jury was for the plaintiff.

(1) 1. The rule that the motorman of a street car or the engineer in charge of a train must so operate his car or engine as to be able to stop it within the

range of the headlight is a rule of safety which conserves the traveling public—the people in a stret car or upon a railroad train—and protects them, as well as the property and the lives of human beings not on such car or train, from a possible source of danger. For this reason the law has adopted the above rule, and declared that it is per se negligence, as matter of law, for a railroad company to run its train, or a street car company to run its car, in the nighttime, with a headlight not having sufficient capacity to cast a light upon the track so that the engineer or motorman may perceive objects for the distance within which the train or car may be stopped.—*Western Railway of Alabama v. Mitchell,* 148 Ala. 35, 41 South. 427. The demand of the traveling public is for speed. The demand of the law is that speed shall be so reasonably regulated and controlled as that property and life shall not thereby be needlessly endangered or destroyed.

The reason which underlies the rule which requires an engineer in charge of a locomotive and the motorman in charge of a street car to keep a lookout for obstructions on the track is the same reason which underlies the above rule with reference to headlights, for, to use the language of counsel for appellee in their brief, "in the nighttime the headlight with its rays must of necessity become the eyes of the engineer or motorman and thus enable him to keep the lookout which his eyes give him the power to do in the daytime."

In the case of *Southern Railway Co. v. Stewart,* 179 Ala. 304, 60 South. 927, this court, in speaking of the duty of a motorman in charge of a street car upon a track which forms a part of the street, said: "On such a track it was the duty of the motorman to keep a lookout for all persons liable to be run over, no matter how

they got on the track, and no matter what they were doing there."

In the case of *Birmingham Railway, Light & Power Co. v. Fuqua,* 174 Ala. 631, 56 South. 578, this court held that, when a car track forms a part of the street, "the law recognizes no distinction between keeping a lookout for one prone, and one erect, on the track. The duty of keeping a lookout is the same in either case." The rule requiring a lookout for persons prone upon a track is, however, limited in this state, in so far as the rights of the person prone upon the track are concerned, to tracks running along and forming parts of public streets.—*Southern Railway Co. v. Stewart,* 179 Ala. 304, 60 South. 927.

In the instant case, therefore, it was the duty of the motorman of the defendant, not only to the public, but also to the plaintiff, to so regulate and control the speed of his car, which he was running on a track which formed a part of this public street, as to be able to stop the car, with the aid of the appliances which he had upon the car, within the distance in which, by the aid of the headlight which was used upon the car, he could see a man prone upon such track. The law exacted this duty of the motorman, and if he failed to observe that duty he was guilty of negligence.—*Southern Railway Co. v. Stewart, supra; B. R., L. & P. Co. v. Fuqua, supra; Western Railway Co. v. Mitchell, supra; Sheffield Co. v. Harris,* 183 Ala. 357, 61 South. 88; *Birmingham Ry., Light & Power Co. v. Jones,* 153 Ala. 157, 45 South. 177. While a motorman running a car over a track which forms a part of a street may not be required to provide against what he has no legal ground to believe will happen (*Schneider v. Mobile & O. R. R. Co.,* 146 Ala. 344, 40 South. 761), he is re

quired to so regulate the speed of his car as to be able to stop it within the distance that he can see so large an object as a man prone upon the track, by the aid of his headlight, in the nighttime, and, if he fails to do this, he fails to exercise those precautions which a reasonably prudent man would be expected to exercise in respect to such a car run under the same conditions. —*Southern Railway Co. v. Stewart, supra; B. R., L. & P. Co. v. Fuqua, supra.*

(2) 2. Ordinary care, when applied to an engineer in charge of a locomotive or to a motorman in charge of a street car, implies that, when the emergency to act quickly in prevention of an injury arises, he must act with that high degree of intelligent diligence with which a reasonably prudent man, in the possession of all his faculties and knowing what to do, would be expected to act under similar circumstances. If the emergency requires that he quickly stop his train or car, then he must use such of the appliances at hand for that purpose as a reasonably prudent man, skilled as an engineer, would, under similar circumstances, be expected to use to quickly stop such train or car, and he must do so with that same degree of celerity or quickness that a reasonably prudent man, skilled in such business, would, under similar circumstances, be expected to display.—*Birmingham Ry., Light & Power Co. v. Ryan,* 148 Ala. 69, 41 South. 616.

(3) 3. In the case of *Anniston Electric Co. v. Rosen,* 159 Ala. 195, 48 South. 798, 133 Am. St. Rep. 32, this court said: "Whether one is or is not a trespasser, the condition to the application of the principle of the negligent breach of duty after peril is discovered is the same. The duty to avert injury to one imperiled is the same, whether his relation to the dangerous agency

theretofore was wrongful or not, whether his situation or peril was the result of right or wrong conduct; provided, of course, the operative knew of the peril to which the injured party was subjected. Whenever the knowledge stated is brought to the operative, his duty is to employ all means known to one skilled in his place to avert injury."

Whether a motorman, after discovering the peril of a trespasser who shows that he is either ignorant, or apparently is regardless of his peril, is guilty of negligence if he fails to employ all means known to a person skilled as a motorman to avert injury to such a trespasser, has not been an open question in this state, certainly since the rendition of the above decision. A man who is drunk or in any way disabled, on a street car track, is entitled to a recovery for damages inflicted upon him by a street car if the motorman saw him on the track in time to prevent the injury, and then negligently failed to use the precautions which a reasonably prudent man skilled as a motorman would have been expected to use to prevent the injury.—*Randle v. Birmingham Ry., Light & Power Co.*, 158 Ala. 532, 48 South. 114; *Birmingham Ry., Light & Power Co. v. Ryan,* 148 Ala. 69, 41 South. 616; *Birmingham Ry., Light & Power Co. v. Morris,* 163 Ala. 190, 50 South. 198.

4. This case has been carefully and ably briefed by counsel on both sides. A careful examination of this record convinces us that, when the oral charge of the court is considered in its entirety, it is free from reversible error. One or two of the sentences used by the trial judge may possibly have had a misleading tendency, but the jury were hardly misled thereby.

The court refused some of the written charges which were requested by the defendant, but the refused

charges were either covered by written charges which were given to the jury at the request of the defendant, or they were elliptical or misleading. The case has not only been well presented here, but it was evidently well tried in the court below. We will not stop to consider the question as to whether, under all the facts, the appellee was entitled to affirmative instructions in his favor. If so, he suffered no injury of which he can complain, as he recovered a verdict and judgment in the trial court, and which judgment, under the law, must here be affirmed.

We find no reversible error in the record, and the judgment of the court below is affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and MAYFIELD, JJ., concur.