## TASSIN v. NEW ORLEANS PUBLIC SERVICE, INC.

———

(February 15, 1932. Opinion and Decree.)
(March 7, 1932. Rehearing Refused.)
(April 25, 1932. Writs of Certiorari and
Review Refused by Supreme Court.)

———

Arthur B. Leopold and M. C. Scharff, of New Orleans, attorneys for plaintiff, appellant.

Ivy G. Kittredge, of New Orleans, attorney for defendant, appellee.

JANVIER, J. At about 3 o'clock in the morning of April 30, 1929, Elvin Tassin, a young boy 14 years of age, lying asleep

on the neutral ground of St. Claude avenue, lost his right foot when it was run over by a street car of New Orleans Public Service, Inc.

Young Tassin's father brings this suit on behalf of his minor son and, for his use and benefit, seeks to recover the sum of $25,000.

The charges of negligence, as we find them outlined in plaintiff's brief, are: That the motorman of the car failed to keep a proper lookout ahead and that he was not using proper care and caution; he did not have the car under control and he gave no warning signal of the approach of the car.

Defendant maintains that young Tassin was lying asleep some 50 feet or more from the street intersection and in a spot so completely obscured by a shadow that his presence was not noticeable; that the car was being operated carefully and prudently, that no part of the boy's body was on the track as the car approached, and that he did not place his foot on. the rail until the car reached a point some five or six feet from that at which the boy was lying and after it was too late for the car to be stopped.

The district judge rendered judgment dismissing the suit and plaintiff has appealed.

The boy, for a short time prior to the day on which the accident occurred, had been an inmate of the Waifs' Home, from which he, together with certain other young fellows about his age, had escaped on the morning before the fateful day.

These boys had, for nearly twenty-four hours, been wandering in different parts of the city, and, at about 2:50 or 2:55 a. m., had reached the corner of St. Claude and Frenchmen streets.

They were, no doubt, tired and sleepy, and, finding a grassy spot in the center of the neutral ground of St. Claude avenue 50 feet or so from the intersection, they made the best of the opportunity for rest, assumed reclining positions, and almost immediately fell asleep.

At that time there were four of them.

On the corner there was a brilliant city street light and, directly between that light and the boys, there was a traffic semaphore signal, the lights in which were, at the time, turned off, which signal box cast a deep shadow over the spot in which they lay.

It so happened that at that point there was a very large wood post, which, to some extent, screened from view some of the boys, and which also, no doubt, increased the darkness at that point.

There is some dispute as to how long they lay asleep, and it may be well to state at this time that from the testimony of the boys themselves, as well as from other circumstances, we have concluded that they had been there only a few minutes, and that between the time at which they lay down and the time at which the accident took place, no other street car had passed.

The street car was on its way downtown, towards the lower end of the city, and, upon leaving Frenchmen street, the motorman had just begun to increase its speed, when, according to his testimony, he for the first time noticed, about five feet ahead of his car, an object which he discovered was a boy's foot, and which object was moving from a position nearer the post towards and over the left rail of the track on which the car was approaching.

Here, again, we may as well state a conclusion to which we have come, which is that the motorman's statement that the foot was not on the rail until just before the car reached it is true. The statement is not contradicted and we find no reason to doubt its correctness. Restless as the boy no doubt was in that uncomfortable location, and possibly somewhat disturbed by the noise of the approaching car, we find nothing improbable in the motorman's statement.

In the case of Moses v. The New Orleans Great Northern Railroad Co. et al., 132 La. 1010, 62 So. 124, a negro had gone asleep in a dark spot adjacent to the rails of a railroad company. The noise of the train disturbed him and he threw out one of his arms, with the result that it fell on the rail after the front wheel had passed. We cite this case merely to show that it is not improbable that an approaching heavy vehicle will disturb a sleeper and cause just what seems to have happened in this case.

As soon as the motorman saw the foot move into a position of danger, he did all that he could to stop the car, but his efforts were fruitless and the car did not come to a stop until it had traveled some 25 or 30 feet, and had, in passing, crushed the foot so badly that amputation thereof was necessary.

Shortly after the accident the city authorities removed the traffic signal box which had cast the shadow, but later the same, or an identical box, was temporarily replaced, so that tests could be made to determine the extent of visibility of persons located under conditions substantially similar.

As a result of these tests, the district judge, who was present at one of them, seems to have been satisfied, as we are, that it was extremely difficult to discover the presence of a person located as was young Tassin at the time of the approach of the car.

Counsel for plaintiff attempt to belittle the results of the test and they contend that no satisfactory proof has been offered to show that, at the time the tests were made, the surrounding conditions were the same as at the time of the accident. The record satisfactorily discloses that, in making the experiment, every effort was made to reproduce the conditions as they originally existed, and we feel that the results may fairly be taken into consideration. The law in this state, as elsewhere, seems to be well settled that:

"* * * to render experiments permissible, or to admit evidence of experiments made out of court, the conditions need not be identical with those existing at the time of the occurrence, but that it is sufficient if there is a substantial similarity." 8 A. L. R., page 18.

In State of Louisiana v. Dunn, 161 La. 576, 109 So. 56, 72, our Supreme Court said:

"Ordinarily the conditions under which the experiment is made must be similar to the conditions that existed when the result contended for occurred, or, at least, substantially similar to them."

Although on behalf of plaintiff an effort was made to show that the clothing worn by the youth at the time of the accident was light in color, and therefore noticeable, we gain from the evidence the impression that the true fact is that the young fellow wore dark clothing, which in the darkness would have escaped detection, even by the most observant. There is no doubt that when he escaped from the

Waifs' Home he was dressed in the usual garments furnished by that institution, which garments, we are informed by the record, are blue, and the story told by the boy that some other boy, whom he scarcely knew, had exchanged clothing with him, is not satisfactory, nor consonant with reason.

We find, then, these facts: A motorman operating his car at 3 o'clock in the morning at a moderate speed; young boys asleep and obscured by shadows on the neutral ground and not at a street intersection. To those boys what measure of duty was owed by defendant company? What precautions should the motorman have taken? It was his duty to use ordinary care to discover them. Surely it cannot be said that there was any reason to expect persons to be lying on the neutral ground at 3 o'clock in the morning, and if it can be argued that there was a duty to expect persons near intersections, surely such duty would not extend to places between street crossings and in the neutral ground, where persons seldom are seen.

The rule of law applicable is well stated in Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 177, 78 So. 438, as follows (syllabus):

"Where a person recklessly places himself in a situation of great and imminent danger, as by lying down on a railway track in such a position, at such a time, and at such a place that the locomotive engineer, while exercising ordinary care, could not recognize and discern his presence in time to avoid running over him, his widow and heirs may not recover from the railroad company damages resulting from his death."

In Brooks v. Texas & P. R. Co., 141 La. 809, 75 So. 731, the rule is again well stated, as follows:

"While a right of recovery may exist in the event of the killing by a train of a person who lies asleep or intoxicated upon a railroad track, the evidence in support of the action should be clear and satisfactory to the effect that, by the exercise of ordinary diligence by the person in charge of the train, the peril of the other might have been discovered and the killing avoided."

Counsel for plaintiff would persuade us that the doctrine announced by us in Grennon v. N. O. Public Service, Inc., 10 La. App. 641, 120 So. 801, is apposite; but in this we cannot agree. Grennon, who had been seen by the conductor of a street car lying intoxicated and helpless on a passenger platform immediately alongside the track of the railway company, was soon after run over by another car of the same company. In the Grennon case we followed Kramer v. N. O., City & Lake R. Co., 51 La. Ann. 1690, 26 So. 411, in holding that it was negligence, after discovering a helpless inebriate in a position of imminent danger, to leave him there. No such facts are shown here. Tassin had not been seen by another employee and his location was so obscure that even a most observant person would not have noticed him. Had he been first seen in his dangerous location and left there to be run over by another car later, the facts would have brought such a case squarely within the protection of Kramer v. N. O., City & Lake R. Co., and there could have been a recovery.

The fact that the motorman had been in the employ of defendant for only something more than a month has no bearing on the case, since we are convinced that he was at least reasonably skillful and ordinarily observant, and that is all that was necessary. He seems to have done everything that could have been done had he

been in the employ of the company for years.

We find remaining only a contention to the effect that the headlight of the car should have been more efficient and should have been of sufficient power and penetration to dispel the shadow and disclose the presence of the sleeping boy. It is said that we should apply to this case the legal principle stated in Raziano v. Trauth, 15 La. App. 650, 131 So. 212, 214, to the effect that:

"Reasonable care requires in many cases that the driver of a motor vehicle drive at a slower speed at night than during the day. One restriction on his speed is that he shall keep the machine under such control and operate it at such a speed that he can stop the machine and avoid an obstruction or danger or another traveler within the distance that the highway is illuminated by his lights."

City street cars, operating where, at almost every corner and in many cases between corners, there are brilliant electric lights, should not be required to maintain headlights such as are properly required of automobiles, which must operate in the darkness of country and suburban roads.

Our attention is not called to any ordinance or statute fixing a standard with which trains and street cars must comply in the matter of headlights and, since the evidence shows that the light on the car with which we are now concerned was equivalent to those used on all other similar cars, defendant, in this particular, has not been negligent. That the rule with reference to the standard of efficiency required of automobile headlights under the decisions mentioned does not apply to all vehicles and in all circumstances, is very apparent from a reading of the decision of the Supreme Court in Bridges v. Kin-

der & N. W. R. R. et al., 149 La. 417, 89 So. 309, 15 A. L. R. 1525, and in Gilliam v. Texas & Pac. Ry. Co., 114 La. 272, 38 So. 166, 168.

In the Gilliam case, the negligence charged was that the defendant "failed to place a light on the forward moving car, such as would enable a brakeman standing at the end of that car to see objects in front of the track in sufficient time to stop the train and to avert threatened injury." It was argued that the lights should have been sufficient to enable "the brakemen or other employees upon those leading cars by means of those lights to discover objects upon the tracks in time to stop the train and avert injury." The court dismissed the suit, thereby holding that no such standard of efficiency should be set, and said:

"We do not think that the widow and child of the deceased could reasonably require that the defendant should have taken greater precautions than it did for his protection."

Nor do we think here that plaintiff in the case at bar can be heard to demand a headlight more efficient than that commonly in use on similar vehicles and under similar conditions.

Montgomery Light & Traction Co. v. Baker, 190 Ala. 144, 67 So. 269, is not analogous because there plaintiff was caught between parts of the rail and was lying upon the track itself and attempting to extricate himself before the car reached him, and, in fact, when it was still about two blocks away. Thus it is evident that even ordinary care would have averted the tragedy.

Nor is the doctrine announced in Peart v. Orleans-Kenner Traction Co., 11 La. App.

11, 123 So. 822, controlling here because there the situation which existed was most dangerous as the result of a fog, which covered the entire surrounding territory, and it is very evident that under such circumstances the utmost care should be exercised and that a motorman should not drive at a speed beyond that which will permit of his making an immediate stop.

Here there was no condition which existed generally which prevented his seeing, and it was only in the particular spot, which was shadowed by the signal box that his vision was obscured. This shadow covered a very small area and was not at a place where persons might be expected. While it is true that one witness testified that this condition had existed for some time and that in that little spot on the neutral ground there was always a shadow, we think it would be going too far to say that there was a duty thereby created in defendant to have asked the city authorities to remove the box, or to have required them to install an unusually bright light, so that this particular shadow might have been dispelled.

The charge that no warning signal was given seems not to have been seriously urged, and we do not see that there was any negligence on the part of the motorman, even if he did fail to ring his bell before he reached that spot. It must be remembered that that spot was not at a crossing and that the motorman had no reason to suspect that there was any person located there, for whom a warning should be given.

Viewing the record as a whole, we fail to see that there was any negligence chargeable to the defendant company in any particular.

The judgment appealed from is affirmed.