Harvey G. Heydorn, a draftsman with a substantial earning capacity, was run over shortly before 4:00 a.m., on July 16, 1943, by an electric street car of New Orleans Public Service, Inc., on the neutral ground of Canal Street, between Miro and Galvez Streets, in New Orleans, and sustained very severe injuries resulting in the amputation of his right leg just above the ankle, a fracture of the left arm, and serious contusions and bruises. Seeking reimbursement for his injuries, suffering, loss of earnings and earning capacity, and for medical and other expenses, he brought this suit in the Civil District Court for the Parish of Orleans against said New Orleans Public Service, Inc., alleging that the accident resulted solely from negligence on the part of the motorman of the street car and without any contributory negligence on his part. He prayed for judgment for $79,138.67.
The Board of Administrators of the Charity Hospital of Louisiana at New Orleans intervened, alleging that at the Charity Hospital Heydorn had been rendered treatment and services made necessary by the injury, and that if the accident was caused by negligence of the employees of defendant corporation, the said defendant was liable to the Board of Administrators of the Charity Hospital in the sum of $234, together with attorney's fees at ten per cent.
Heydorn made allegations of fact and charges of negligence which may be summarized as follows:
That he had gone to sleep partially "between the inbound track" of the said railway company "with one leg thereon" when a street car of defendant company ran over him "severing his foot and part of his leg," and causing the other injuries already mentioned, and that the motorman was at fault in that "he did not keep a proper lookout for obstructions or persons who might have been on the track * * *"; that "he saw or should have seen petitioner lying in a precarious position with his leg stretched across defendant's track, his view being unobstructed for a distance of more than two hundred feet * * *"; that "he did not have the street car under sufficient control and that same was being operated in a highly dangerous manner * * * in that it was being driven at a high rate of speed and could not have been brought to a stop within a distance which would have been safe;" and in that "said motorman failed to slacken his speed despite the fact that he was approaching a dangerous crossing, and after striking petitioner and causing his injuries, failed to stop the street car operated by him and return to see what damage he had caused."
Plaintiff especially alleged "that defendant's employee had the last clear chance to avoid the accident, but made no attempt to do so."
Defendant corporation denied the occurrence of the accident — for reasons which we shall hereafter set forth — but averred in effect that, if such an accident occurred as alleged, its employees were entirely without fault, and that if plaintiff was injured as averred by him, his injuries "were solely and alone caused through his own acts of negligence and carelessness * * *."
In the alternative that it should appear that there was any negligence on the part of any employee of defendant corporation, then it alleged that the accident was caused not by that negligence, but by the contributory negligence of plaintiff himself in the following particulars:
"Falling asleep in the dead of night on the neutral ground of Canal Street in the immediate vicinity of a street car track * * *" and "in a group of azalea plants, which rendered it difficult, if not impossible, to ascertain his presence;" in "moving his leg into such a position that it passed under the wheels of one of respondent's street cars"; in "falling asleep in a place immediately adjacent to respondent's street car tracks where the azalea bushes in question caused a shadow to fall on the track closest to said azalea bushes"; in "placing his leg on respondent's car track, at a time when one of respondent's cars was passing"; in "attempting to cross the neutral ground on Canal Street in the middle of the block and at a point not ordinarily used by pedestrians;" and in "violating all of the rules of reason and self-protection * * *."
There was judgment in the Civil District Court in favor of defendant, dismissing the *Page 895 
suit and the intervention, and plaintiff and the Board of Administrators of the Charity Hospital have appealed.
It seems to be made clear in the record, and counsel for plaintiff not only concede it but, in fact, largely rely upon it, that plaintiff had become very much intoxicated during the night which preceded the accident, and as a result had gone to sleep on or near the track shortly before the arrival of the street car and had thus lost all ability to appreciate his danger, or to save himself.
The record shows that, for several hours, plaintiff had imbibed very freely with friends in various so-called cocktail lounges and, at about 3:00 a.m., had found himself in the vicinity of Miro and Galvez Streets. He said that he wandered across the street with a rather hazy intention of boarding a street car; that he saw no car coming and walked "cater-corner" to where the cars stop at the corner of Canal and Galvez Streets. He then said: "At that time I looked again and didn't see any street car coming, and I stood for a few minutes, and then I sat down, and that's the last I remember."
Even his recital of the events which had occurred up to that time evidences an uncertainty as to what actually occurred, for he said: "It is more or less guesswork with me."
The fact that he actually knew nothing at all about what took place is evidenced by his conflicting statements made at various times. In the report of the Charity Hospital there is a "history" in which it appears that the patient "states that he was attempting to cross street car track and was struck by street car which ran across his right leg. * * *". A claim adjuster of defendant company testified that Heydorn had made a statement to the effect that he noticed the street car coming in Canal Street at a fast rate of speed and swaying from side to side, and that he started to run across Canal Street in an uptown direction and that on the inbound track he stumbled and fell, was unable to get up, and that the car ran over him. In his petition, he alleges that while he was asleep, lying partially beyond the inbound track, "with one leg thereon" the street car ran over it, but in his testimony he stated that he did not know how he was seated, and when he was asked whether his legs were on the track, he said:
"No, I don't believe I could have changed positions."
His counsel, as we have already said, do not attempt to deny his condition, and, in fact, point to it as indicating that he could not have been guilty of contributory negligence, and they argue that there is liabiliity in the defendant because, while plaintiff was lying there completely helpless, he should have been seen by the motorman who, if his car had been under control, could have stopped it before reaching him.
Although, in its answer, the defendant company denied that plaintiff was run over by one of its street cars, the record leaves no other conclusion possible, and defendant did not attempt to prove that the car did not cause the injury. It merely offered evidence tending to show that its motorman did not know that he had run over plaintiff's leg, and that under the surrounding circumstances and conditions, it was not negligence for him to fail to see plaintiff before the car reached him and to fail to discover his presence even afterwards.
There is then little dispute over the principal facts, and the controversy arises over the question of whether the failure of the motorman to see the plaintiff was such negligence as to justify a recovery by plaintiff.
There is a disagreement over one rather important fact and that is whether plaintiff's leg was lying across the rail as the car approached, or was thrown over the rail as plaintiff was aroused by the noise of the passing car and after the front wheels had already gone by.
On Canal Street there is a very wide neutral ground and on it at that point there are two street car tracks, each of which is about 16 feet from the edge of the neutral ground. On this neutral ground and between the outer rail of the inbound track and the paved driveway, there is a paved passenger platform level with the ground. This platform extends from Galvez Street back towards Miro Street a distance of 60 feet. Twenty-one feet from the end of this paved platform, there is a bed of azaleas 4 *Page 896 
or 5 feet wide, the nearest edge of which is about 16 to 22 inches from the outer rail and which bed is about 24 or 26 feet in length. Between the outside edge of this azalea bed and the edge of the neutral ground there is a street light so located that this light throws the shadow of the azalea bushes towards the nearest rail of the inbound track, which is the rail on which plaintiff received his injuries. The post from which this light hangs is between the light and the rail so that the shadow of this post, which shadow is about 10 inches wide, extends completely across the track. The azalea bushes themselves threw shadows from this light, but those serrated shadows, except at one point, did not extend across the inbound rail, nearly all of them extending irregularly to points only a few inches from the rail.
There were two other street lights in the immediate vicinity which, to some extent, illuminated the spot at which plaintiff was lying. One of those lights was 88 feet away on the neutral ground at the auxiliary crossing between Miro and Galvez S'treets, and the other was 105 feet away on the neutral ground at the corner of Galvez Street. Both of these lights were on the downtown edge of the neutral ground so that neither threw shadows of the azalea bushes towards the rail. Around this azalea bed there was a shallow trench estimated at from 2 to 5 or 6 inches in depth, the azalea bushes reaching in height from 41/2 to 5 feet. Plaintiff was lying among the bushes or in this trench, some 85 or 90 feet from the corner of Galvez Street and 30 or 35 feet from the nearest end of the passenger platform. His clothing was dark, his shirt being blue, and his trousers brown. Only his hat was white, and obviously, his head, at least, was in the azalea bushes or lying under them.
The record leaves no room for doubt that the car was proceeding at a moderate speed of from 8 to 10 miles an hour and that the motorman brought it to a stop at its usual stopping point alongside the passenger platform, though there is some evidence to the effect that when it had stopped its front end extended a short distance into the crossing of Galvez Street. The record shows that the company's rules require that all cars be brought to a stop before crossing Galvez Street.
The record shows, without any contradiction, that as the car reached a point about opposite the azalea bed, the motorman, the conductor, and several of the passengers heard two distinct clicks or noises which they all said gave the impression that the car had run over a stick or a stone. The two clicks which came from the rear of the car indicated to these witnesses that it was the two wheels on that side of the rear truck of the car that had run over the object, whatever it was. The motorman stated that before he heard the two clicks, he had seen nothing extending across the track.
When the car was brought to a stop, the motorman, in an effort to discover what it was that had been run over, got out, looked under the car and around it, and neither saw nor heard anything. Being urged by various passengers to proceed on his route so that they would not be late for work, the motorman got back on his car and went to the end of his route on Canal Street near the Mississippi River. On its way back from the river, as the car reached Galvez Street, it was stopped by persons who had discovered the injured plaintiff, but even then the motorman and the conductor did not realize that it was their car which had caused the injury. Later, as they were completing their run, they thought over the earlier occurrence and then realized that possibly their car had run over plaintiff on its inbound trip when they had heard the two clicks which the motorman had investigated.
Though an earnest effort was made to discredit the witnesses who stated that they had felt and heard the two clicks which had come from the rear of the car after the front end had passed, it is made very certain that these witnesses could not have been mistaken and that it was in truth that particular car which struck the plaintiff. It is shown that at that time in the early morning most of the persons who used such street cars are regular passengers, each of whom rides the same street car every day. And it appears from this that after the accident had been brought to the attention of the crew, they remembered *Page 897 
some of the persons who had been on the car at the time, and, though otherwise it might have been difficult to locate witnesses, under these circumstances it was possible to remember what persons had been on that particular street car. Two of the witnesses say that they learned of the accident in the newspaper and then remembered that they had been in the street car. It was in this way that these two witnesses were located by the defendant company. The record shows, too, that it could not have been any other street car because at that time of the morning only two were operated on that route and there was no other which could have passed over that track at that time, the other being far away at the other end of the route.
[1] Two lighting experts were placed on the stand, one by plaintiff and one by defendant. They stated that they made exhaustive tests shortly before the case came to trial which was almost two years after the occurrence of the accident. The record, and particularly photographs introduced in evidence, show that unquestionably when these tests were made the azalea bushes were not nearly so high or so thick as they had been at the time of the occurrence of the accident. According to these tests the illumination outside of the shadows was sufficient to comply with the standard required for street lighting, though it appears to us that this standard was very low, for the witnesses agreed that 16% of 1 foot candle power was sufficient. These tests showed, however, that in the shadows cast by the light post and by the azaleas the illumination was very much below standard, amounting to only .02 of 1 foot candle power. These tests were made without the additional illumination thrown by the headlight of a street car. And while we are discussing the question of the illumination thrown by the headlight of such a street car, let us say that the evidence shows that the headlight of a street car gives little illumination to the sides of the track, it being confined almost entirely to the space between the two rails and that the evidence shows also, and there is nothing to the contrary, that in cities the headlights of street cars are intended to show to pedestrians and operators of vehicles that a street car is approaching and add very little to the illumination by which the motorman is expected to see persons or things on or near the track. This was recognized in Tassin v. New Orleans Public Service, Inc., 19 La. App. 456, 139 So. 695, 698, in which we said: "City street cars, operating where, at almost every corner and in many cases between corners, there are brilliant electric lights, should not be required to maintain headlights such as are properly required of automobiles, which must operate in the darkness of country and suburban roads."
Counsel for plaintiff, in their effort to show that the motorman should have been particularly on the alert, point to the fact that the street car was approaching Galvez Street, which is a safety stop. They show that a safety stop is a point at which all cars must be brought to a stop because of dangerous conditions at that point. We think, however, that the fact that Galvez Street is such a stop cannot be pointed to as proof of the fact that the motorman should have been looking for persons sleeping on the neutral ground 100 feet away. The danger of such crossings comes from the fact that there is much traffic on the intersecting street and that there are frequently passengers waiting on the platform to board the street cars coming up to the intersection. In such a situation, it is the duty of the motorman approaching such a crossing to be on the alert for crossing traffic and for persons waiting for a street car, and, therefore, it is to be expected that his attention will not be directed to the ground alongside the track 100 feet before his car reaches the crossing.
When we consider whether the motorman should have seen plaintiff before reaching him, we are impressed by several facts. The witness Dearie, placed on the stand by plaintiff, found it necessary to use a flashlight in making an investigation when, in passing in his taxicab, he heard plaintiff call for help and saw him wave a handkerchief. *Page 898 
The witness Mara, who also was passing in his automobile and was attracted by hearing a call and seeing a handkerchief wave, says that in order to see better he placed his car so that its headlight could shine upon Heydorn. He says that it was quite dark and when asked whether he could see the man himself when he looked from Miro Street, he said: "Well, frankly, I'll tell you, if it wasn't for the handkerchief, I probably wouldn't have seen him at all."
It must be remembered that this was after his attention had been directed to the fact that some one was calling and waving a handkerchief, apparently in trouble, on the neutral ground.
That it must have been dark is also evidenced by the fact that when the motorman got out of his street car to look to see if he could discover whether his car had run over anything, even though he was looking for something, he could not see Heydorn lying in the bushes.
[2] If the motorman should have seen plaintiff, since the plaintiff had lost all power to save himself and was, therefore, not capable of being guilty of contributory negligence, there would be liability in the defendant company. We say this because of the doctrine which has come to prominence and is now well recognized as the Doctrine of Discovered Peril. Under this doctrine, which grows out of and is an extension of the doctrine of the Last Clear Chance, one who may have been at fault in negligently placing himself in a precarious situation but who no longer has the ability to save himself, may nevertheless, recover from some other person who causes him injury if the other person, having discovered the peril and having the ability to avoid an accident, fails to do so. This was what was held in Rottman v. Beverly, 183 La. 947,165 So. 153. This doctrine was later extended and it is now held that there may be liability not only if the other person actually discovers the peril and fails to avert it, but also if the other person should have discovered it. This was what was held in Jackson v. Cook, La. App., 176 So. 622.
[3, 4] While it is true that where there are shown facts which make this doctrine applicable, the burden shifts to the defendant to explain the failure to see the person who should have been seen, the doctrine has no application until the plaintiff has first shown the necessary facts. In other words, he must first show that he, himself, has lost the ability to save himself and that the defendant could have seen him and could have avoided an accident. The plaintiff here has shown only the first fact; that he himself had lost the ability to save himself. He has shown none of the other necessary facts except that he was later injured. The burden was on him to show these other facts as it always is when a plaintiff relies for recovery upon the Doctrine of the Last Clear Chance and the extension of it, the Doctrine of Discovered Peril. See Courtney v. Louisiana Ry. Navigation Co., 133 La. 360, 63 So. 48.
But the defendant has not relied on the failure of plaintiff to prove these necessary facts, for defendant has gone farther and affirmatively shown that the motorman was not at fault in failing to see the plaintiff as his car approached the bushes.
The record leaves no room for doubt as is evidenced by the fact that it was obviously only the last two wheels of the street car which passed over the leg of plaintiff, that as the car approached him, his leg was not lying on the rail. There is no evidence that there was any blood on any of the wheels of the car by which it could be determined which wheel struck him first, but since the street car continued on its run all the way to the end of the line and then back from the end of the line to Galvez Street before it was stopped, if there had been any blood on any of the wheels it might have so completely disappeared by that time as to have been not noticeable. We say this because in a somewhat similar situation in the case of Moses v. New Orleans Great Northern R. R. Co., 132 La. 1010, 62 So. 124, the Supreme Court found that since the blood was discovered only on the rear wheels of the locomotive, the arm of the plaintiff, which was cut off by the locomotive, could not have been lying across the rail as the *Page 899 
locomotive approached and must have been thrown over the rail after the plaintiff, lying alongside the track, was aroused by the noise of the passing locomotive.
Counsel for defendant call attention to three cases, each of which involves somewhat similar facts, and they argue that all are authority for the conclusion that there was no negligence in the motorman in the case at bar. These cases are: Moses v. New Orleans Great Northern R. R. Co., supra, Tassin v. New Orleans Public Service, Inc., supra, and Kramer v. New Orleans, City Lake R. R. Co., 51 La. Ann. 1689, 26 So. 411.
In the Moses case plaintiff had gone to sleep at night alongside a railroad track within a passenger depot in New Orleans. The city lights threw a shadow of a concrete wall across him and across the track. As the locomotive came into the station, Moses was awakened by the noise it made and he threw out his arm, which up to that time had not been across the rail, after the first wheels of the locomotive had passed. The Supreme Court held that there was no negligence in the engineer in failing to notice that Moses was lying alongside the track.
In the Tassin case, a boy, fourteen years old, had gone to sleep on the neutral ground on St. Claude Avenue in New Orleans, and at about 3 o'clock in the morning, a street car ran over his right leg, cutting off his foot. The evidence showed that the spot at which the boy lay was "obscured by shadows on the neutral ground" and was "not at a street intersection." We held that it was the duty of the motorman to use ordinary care to discover this third person, and we said that "if it can be argued that there was a duty to expect persons near intersections, surely such duty would not extend to places between street crossings and in the neutral ground, where persons seldom are seen."
As in the Moses case and also in the case at bar, young Tassin did not extend his foot over the rail until just as the car was about to reach him.
In the Kramer case, the plaintiff had gone to sleep alongside a street railway track where his body was partially obscured by grass and in a location which, because of a curve, made it difficult or impossible for the motorman to see him until the car was rather close. The Supreme Court held that there was no liability.
Counsel for plaintiff, seeking to distinguish these cases, point to Brown v. Chicago, R. I. P. Ry. Co., La. App.,14 So.2d 307, and Griggs v. Kansas City Rys. Co., Mo. Sup., 228 S.W. 508, 511, as presenting facts practically identical with those in the case at bar.
In the Griggs case, the plaintiff, very drunk, went to sleep at night in a dangerous position and was run over and killed by a street car. The defendant was held liable. But the evidence showed that plaintiff had been actually discovered by the motorman of the street car when the car was a sufficient distance away for it to have stopped, at the speed at which it was running, if the motorman had been on the alert. There was further evidence to show that such an object as the body of a man, because of the lighting conditions at that point and at that time, "could have been discovered and identified" at a distance of 250 feet.
The facts of the Brown case are very similar to those presented in the case at bar, particularly in that Brown was not seen by either the engineer or the fireman of the locomotive, who did not know that he had been struck by their train. But the distinguishing feature of that case is that there the Court found the all important fact that Brown should have been seen, since he was actually on the track. The Court said [14 So.2d 309]: "* * * we are definitely of the opinion that plaintiff was on the track where he could and should have been seen by the engineer or fireman, or both, if they had been keeping a proper lookout at the time."
Brown had been seen only a very short time before at about 5:15 o'clock in the morning by a negro woman who had passed, and who testified that when she saw him he was seated on the end of a cross-tie. At 5:15 o'clock in the morning *Page 900 
of July 4th, at Rusten, Louisiana, day had already broken.
Another interesting feature of the Brown case is that the Court there found, as we find here, that although there was no actual eyewitness to the occurrence, the circumstantial evidences were so strong that there was no other conclusion possible than that the plaintiff had actually been struck by the vehicle of defendant. The Court said: "* * * To place any other interpretation upon the chain of circumstances presented would be to adopt a strained, speculative and hypothetical conclusion which is not justified by the facts, * * *."
[5, 6] While there are facts in all of these cited cases which are similar to some of those now under consideration, it may not be said that any one of them is identical with this case. We feel that no one of them is authority for the view that in any such case there may be laid down a hard and fast rule for determining just how far the engineer of a locomotive or the motorman of a street car should see a man's body lying on or near the track. But we feel that all of them are authority for the view that in such cases all of the surrounding circumstances must be taken into consideration, and when we take all of the surrounding circumstances into consideration we do not think that the motorman was guilty of negligence in failing to see plaintiff lying as he was in the shadow of the azalea bushes and with no part of his body extending across the rail as the car approached him. The shadows, as already stated, were serrated; at least one of them and the shadow of the lamp post extending across the rail. The others extended for varying distances towards the rail.
It was more difficult to see and recognize an object lying among such shadows than it would have been had there been only one solid and clearly defined shadow.
[7] To hold that there was negligence here would be to hold that a motorman owes to third persons the absolute duty of discovering them when they place themselves alongside such tracks. There is no such duty. We repeat what we said in the Tassin case, that where such third persons are involved the motorman or engineer must exercise ordinary care to discover them.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.